**McADOO v. UNIV. OF N.C. AT CHAPEL HILL**

[225 N.C. App. 50 (2013)]

MICHAEL McADOO, Plaintiff

v.

UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL; H. HOLDEN THORP in his
official capacity as Chancellor of the University of North Carolina at Chapel Hill;
and NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, Defendants

No. COA12-256

Filed 15 January 2013

**Contracts—breach—Athletics Scholarship Agreement—hypo-
thetical and speculative injury—mootness**

Plaintiff former University of North Carolina football player
did not raise any justiciable issues under the Athletics Scholarship
Agreement (ASA) because: (1) he did not state facts making out a
prima facie breach of the ASA as an express contract; (2) his
alleged injury was too hypothetical and speculative to provide him
with standing; and (3) his claims were moot. Plaintiff did not sus-
tain any "injury in fact" because his scholarship was never termi-
nated. Further, plaintiff accomplished the goal he sought to
achieve, which was playing in the National Football League.
Finally, the remedies plaintiff sought, both in compensation and
declaratory judgment, were hypothetical in nature.

Appeal by Plaintiff from order entered 23 November 2011 by
Judge Orlando F. Hudson, Jr. in Durham County Superior Court.
Heard in the Court of Appeals 13 September 2012.

*Nelson Mullins Riley & Scarborough LLP, by Noah H.
Huffstetler, III, Stephen D. Martin, and Elizabeth B. Frock, for
plaintiff-appellant.*

*Attorney General Roy Cooper, by Special Deputy Attorney
General Melissa L. Trippe and Assistant Attorney General
Stephanie A. Brennan, for defendant-appellees the University of
North Carolina at Chapel Hill and H. Holden Thorp.*

*Ellis & Winters LLP, by Paul K. Sun, Jr., Thomas H. Segars, and
Jeremy N. Falcone, and Spencer Fane Britt & Browne LLP, by
Jonathan F. Duncan and William C. Odle, for defendant-
appellee National Collegiate Athletic Association.*

*Poyner Spruill LLP, by Robert F. Orr and John W. O'Hale, for
Student Athlete Human Rights Project, amicus curiae.*

HUNTER, JR., Robert N., Judge.

Michael McAdoo ("Plaintiff" or "McAdoo") appeals from a 23 November 2011 order dismissing his amended complaint. Upon *de novo* review and based upon the record presented, we affirm the trial court's order on the sole ground that the dispute does not present a justiciable controversy. This affirmation makes it unnecessary to reach the other issues raised by Plaintiff.

## I. Jurisdiction and Standard of Review

This Court has jurisdiction to hear the instant appeal pursuant to N.C. Gen. Stat. § 7A-27(b) (2011). "The standard of review on a motion to dismiss under Rule 12(b)(1) for lack of jurisdiction is *de novo.*" *Fairfield Harbor Property Owners Ass'n, Inc. v. Midsouth Golf, LLC,* ___ N.C. App ___, ___, 715 S.E.2d 273, 280 (2011) (quotation marks and citation omitted). " 'Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment' for that of the lower tribunal." *State v. Williams,* 362 N.C. 628, 632-33, 669 S.E.2d 290, 294 (2008) (quoting *In re Greens of Pine Glen Ltd.,* 356 N.C. 642, 647, 576 S.E.2d 316, 319 (2003)).

All three Defendants filed Rule 12(b)(1) motions in this case raising lack of justiciability as a component of subject matter jurisdiction. "Concepts of justiciability have been developed to identify appropriate occasions for judicial action. . . . The central concepts often are elaborated into more specific categories of justiciability— advisory opinions, feigned and collusive cases, standing, ripeness, mootness, political questions, and administrative questions." 13 Charles A. Wright et al., *Federal Practice and Procedure* § 3529, at 278-79 (2d ed. 1984). Thus, the trial court's rulings dismissing Plaintiff's claims for relief on the basis of "standing" and "mootness" are necessarily incorporated into its decision to dismiss the complaint on "justiciability" grounds.

In *Neuse River Foundation, Inc. v. Smithfield Foods, Inc.,* 155 N.C. App. 110, 574 S.E.2d 48 (2002), our Court discussed "standing" as a subset of the justiciability doctrine and compared its federal and state counterparts as follows:

> Standing is among the "justiciability doctrines" developed by federal courts to give meaning to the United States Constitution's "case or controversy" requirement. U.S. Const. Art. 3, § 2. The term refers to whether a party has a sufficient stake in an otherwise

justiciable controversy so as to properly seek adjudication of the matter. *Sierra Club v. Morton*, 405 U.S. 727, 731-32, 92 S.Ct. 1361, 1364-65, 31 L.Ed.2d 636, 641 (1972). The "irreducible constitutional minimum" of standing contains three elements:

(1) "injury in fact"—an invasion of a legally protected interest that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan* [*v. Defenders of Wildlife*], 504 U.S. [555,] 560–61 [(1992)].

North Carolina courts are not constrained by the "case or controversy" requirement of Article III of the United States Constitution. Our courts, nevertheless, began using the term "standing" in the 1960s and 1970s to refer generally to a party's right to have a court decide the merits of a dispute. *See, e.g., Stanley, Edwards, Henderson v. Dept. of Conservation & Development*, 284 N.C. 15, 28, 199 S.E.2d 641, 650 (1973).

*Id.* at 114, 574 S.E.2d at 51–52.

Like "standing," "mootness" is another subset of the justiciability doctrine. Our Court, for example, in *Hindman v. Appalachian State Univ.*, ___ N.C. App. ___, 723 S.E.2d 579 (2012), recently applied the mootness doctrine as follows:

Although plaintiffs argue that a mere declaration of a past wrong is a sufficient basis for a declaratory judgment action, it is still true that actions filed under the Declaratory Judgment Act, N.C. Gen. Stat. §§ 1-253 through –267 (2005), are subject to traditional mootness analysis. A case is considered moot when a determination is sought on a matter which, when rendered, cannot have any practical effect on the existing controversy. Typically, courts will not entertain such cases because it is not the responsibility of courts to decide abstract propositions of law.

*Id.* at ___, 723 S.E.2d at 581 (quoting *Citizens Addressing Reassignment and Educ., Inc. v. Wake Cty. Bd. of Educ.*, 182 N.C. App. 241, 246, 641 S.E.2d 824, 827 (2007) (quotation marks omitted).

## II. Factual History

McAdoo was a highly-recruited high school football player from Antioch, Tennessee. He received a football scholarship to the University of North Carolina at Chapel Hill ("UNC"), a member of the Atlantic Coast Conference ("ACC") of the National Collegiate Athletic Association ("NCAA").[1] After signing the relevant form agreements and enrolling, McAdoo played football for UNC during the 2008 and 2009 seasons.

In order to "participate in intercollegiate competition," McAdoo signed a document entitled "Student-Athlete Statement—Division I" (the "Statement") on 31 July 2008. The Statement contains the following affirmations:

> You affirm that your institution has provided you a copy of the Summary of NCAA Regulations or the relevant sections of the Division I Manual and that your director of athletics (or his or her designee) gave you the opportunity to ask questions about them.
>
> You affirm that you meet the NCAA regulations for student-athletes regarding eligibility, recruitment, financial aid, [and] amateur status[.]
>
> . . . .
>
> You affirm that you have reported to the director of athletics or his or her designee of your institution any violations of NCAA regulations involving you and your institution.
>
> You affirm that you understand that if you sign this statement falsely or erroneously, you violate NCAA legislation on ethical conduct and you will further jeopardize your eligibility.

---

1. The NCAA is a private, voluntary association that administers intercollegiate athletic competition between higher education institutions in 23 sports. It has approximately 1,273 members, 1,066 of which are higher education institutions. 340 schools comprise Division I of the NCAA, 290 schools are in Division II, and 436 schools make up the NCAA's Division III. *About the NCAA*, Nat'l Collegiate Athletic Ass'n, http://www.ncaa.org/wps/wcm/connect/public/ncaa/about+the+ncaa/membership+new (last visited 4 January 2013).

The Statement further cautions that:

> [b]efore you sign this form, you should read the Summary of NCAA Regulations provided by your director of athletics or his or her designee or read the bylaws of the NCAA Division I Manual that deal with your eligibility. If you have any questions, you should discuss them with your director of athletics or your institution's compliance officer, or you may contact the NCAA[.]

The Statement specifically directs student-athletes to examine NCAA Bylaws 10, 12, 13, 14, 14.1.3.1, 15, 16, 18.4, and 31.2.3, which deal with player eligibility. When Plaintiff signed the Statement, he affirmed "[his] institution has provided [him] with a copy of the Summary of NCAA Regulations or the relevant sections of the Division I Manual and that [his] director of athletics (or his or her designee) gave [him] the opportunity to ask questions about them." Plaintiff also signed a second similar statement on 6 August 2009.

All student-athletes at UNC also have access to a Student-Athlete Handbook (the "Handbook") which summarizes, *inter alia*, relevant UNC, ACC, and NCAA regulations and standards of conduct. The Handbook states:

> [i]t shall be the responsibility of every student at the University of North Carolina at Chapel Hill to obey and support the enforcement of the Honor Code, which prohibits lying, cheating, or stealing when these actions involve academic processes or University, student, or academic personnel acting in an official capacity.

The Handbook specifically addresses plagiarism as a "serious academic offense":

> Normally, it is considered cheating if you have unauthorized help on examinations or course work. Plagiarism is submitting a paper or project written by someone else or paraphrasing someone else's ideas and claiming the material as your own.

> Scholastic integrity is strongly supported not only by the University, but also by the student body through the University's Honor System. If you have questions regarding the Honor System, check with your professor or an academic counselor before turning in your paper in

question. Students have been accused of plagiarism simply because they didn't understand that when paraphrasing someone else's work, they must still acknowledge the source.

Because this has been an area of confusion for some students, general tips on how to avoid plagiarism have been included in the Academics Section of this handbook.

Another section of the Handbook deals with unintended plagiarism, stating "[o]ccasionally, scholastic dishonesty occurs as the result of a lack of information or misinformation. Everyone knows cheating on an exam is dishonest; however, students have, on occasion, turned in papers which they thought were acceptable only to find they were accused of plagiarism." The Handbook clarifies that while "[t]utors are available in select subjects[,]" "[t]hey are there to help you understand your assignments, not to do your work for you." UNC also provided Plaintiff with a summary of NCAA regulations in the Handbook.

During McAdoo's time at UNC, in addition to room, board, and in-state tuition, he received tutoring from Ms. Jennifer Wiley ("Wiley"), a UNC student paid by UNC to assist McAdoo in his studies. Wiley was assigned to Plaintiff for several classes from fall 2008 to summer 2009, including African Studies ("AFRI") 266 and Afro-American Studies ("AFAM") 428.

During the summer of 2009, Wiley ceased working with the Academic Support Program. The Academic Support Program subsequently assigned Plaintiff a new student tutor. In July 2009, while completing a paper for Swahili ("SWAH") 403 during Summer Session II, Plaintiff sought out Wiley's help on the footnotes and Works Cited sections even though she was no longer his assigned tutor. Specifically, on 15 July 2010, he e-mailed Wiley his paper, stating "the words in bold is what need to be sited" (sic). Plaintiff also included a list of eight websites and one book numbered by where they needed to be cited in his paper. Wiley completed the footnotes and Works Cited sections. Later that night, she e-mailed the finished paper to Plaintiff, saying, "i think i did this right...i used APA citations for the bold stuff...and i made the works cited for all those websites...hope this helps!" Plaintiff then submitted the finished paper to his professor.

In June 2010, the NCAA began investigating reports that UNC football players had received improper benefits from sports agents. As part of the investigation, NCAA officials interviewed McAdoo

about a weekend trip to Washington, D.C., during which he unknowingly received improper benefits valued at $99.[2]

This investigation went in an unexpected direction when UNC began to inspect the players' e-mail communications for evidence of improper sports agent contacts. When UNC examined McAdoo's e-mails, it found reason to believe Wiley's assistance to McAdoo may have violated the school's academic honesty standards. UNC then interviewed McAdoo on 24 August 2010 and 29 August 2010 about Wiley's assistance. Plaintiff described the help Wiley provided on his SWAH 403 paper. He said this level of assistance was characteristic of the help she provided throughout his time working with her.

Following this discovery, UNC then submitted a hypothetical scenario to the NCAA's Academic and Membership Affairs ("AMA") Department theoretically describing Wiley's assistance on Plaintiff's SWAH 403 paper. AMA staff determined a violation of NCAA Bylaw 10.1-(b) had occurred. NCAA Bylaw 10.1-(b) states that prohibited unethical conduct includes "[k]nowing involvement in arranging for fraudulent academic credit or false transcripts for a prospective or an enrolled student-athlete." Based on the interviews with Plaintiff, UNC believed Plaintiff had also previously violated NCAA Bylaw 10.1-(b) in other instances.

As a member of the NCAA, UNC must comply with NCAA regulations. NCAA regulations, including the NCAA constitution and bylaws, are set forth in its annually-published Division I Manual. According to NCAA Bylaw 10.4, student-athletes who violate NCAA Bylaw 10.1 are ineligible for further intercollegiate competition. NCAA Bylaw 14.11.1 provides that "[i]f a student-athlete is ineligible under [NCAA regulations], the institution shall be obligated to apply immediately the applicable rule and to withhold the student-athlete from all intercollegiate competition." The member institution (the "Institution") must then report that determination to the NCAA. NCAA Bylaw 14.12.1 allows the Institution to "appeal to the Committee on Student-Athlete Reinstatement for restoration of the student's eligibility, provided the [I]nstitution concludes that the circumstances warrant restoration of eligibility."

---

2. In April 2010, Plaintiff traveled for a weekend to Washington, D.C. with two teammates. Plaintiff shared a room with a teammate for two nights at a hotel that cost $89 per night. During the trip, one of Plaintiff's teammates told him the teammate would pay for the weekend. Unbeknownst to Plaintiff, however, the trip was actually paid for by Todd Stewart ("Stewart"), a "prospective agent." During the trip, Stewart also helped Plaintiff obtain free entry into a night club that had a $10 cover charge.

McADOO v. UNIV. OF N.C. AT CHAPEL HILL

[225 N.C. App. 50 (2013)]

According to the Policies and Procedures (the "Policies and Procedures") of the Committee on Student-Athlete Reinstatement (the "Committee"), "[t]he [I]nstitution is responsible for developing complete, accurate, and thorough information prior to submitting a reinstatement request." After the Committee staff "has reviewed the [I]nstitution's request and has completed its research," the staff will approve, conditionally approve, or deny the request.

In accordance with NCAA regulations, on 2 September 2010 UNC declared Plaintiff ineligible to play intercollegiate athletics and withheld him from the first three games of the 2010 season. UNC reported its decision to the NCAA and also referred the case to the student-run UNC Honor Court. On 28 September 2010, Richard A. Baddour ("Baddour"), UNC's Director of Athletics, submitted to Jennifer Henderson ("Henderson"), the NCAA Director of Student-Athlete Reinstatement, UNC's petition to reinstate Plaintiff's eligibility (the "Petition"). In the Petition, UNC referenced three violations of NCAA regulations: (1) Plaintiff's receipt of tutoring from Wiley valued at $11 (for one hour of assistance on the SWAH 403 paper); (2) Plaintiff's receipt of $99 in benefits from a prospective agent in Washington, D.C.; and (3) academic fraud under NCAA Bylaw 10.1-(b).

In the Petition, UNC specifically stated "the academic assistance provided to Mr. McAdoo throughout the Fall of 2008 and Summer of 2009 has, at least in some instances, crossed the line into academic fraud, as interpreted by AMA staff under Bylaw 10.1-(b)." UNC referenced Wiley's assistance in AFRI 266, AFAM 428, and SWAH 403. Still, UNC contended "it was reasonable for Mr. McAdoo to assume that the type of assistance offered and provided to him by his formally-assigned tutor in the Academic Support Program would be permissible" and that "Mr. McAdoo was not aware that the assistance being provided him by the institutional staff member was improper." UNC told the NCAA "the facts surrounding the academic fraud have been submitted to the UNC Honor Court to be processed according to their policies for all students." UNC also said it would update the NCAA as the honor cases progressed.

On 4 October 2010, Baddour submitted UNC's revised report to Henderson. In this report, Baddour informed the NCAA that the UNC Student Attorney General did not bring honor charges against Plaintiff for AFAM 428, but did file honor charges relating to AFRI 266 and SWAH 403.

On 14 October 2010, UNC's Undergraduate Honor Court found Plaintiff not guilty of honor charges related to AFRI 266, but guilty with regard to the SWAH 403 paper. The Honor Court used the standard of "beyond a reasonable doubt." The Honor Court focused on the text of e-mails between Wiley and Plaintiff. For instance, it found Wiley implied she had completed Plaintiff's assignment when she stated "i think i did this right[,]" "i used APA citations for the bold stuff[,]" and "i made the works cited for all those websites[.]" It sanctioned Plaintiff with academic probation for Fall 2010, suspension for Spring 2011, and a failing grade on the assignment in SWAH 403. Due to his academic probation, Plaintiff was not permitted to play football for the rest of the Fall 2010 season. But for the NCAA sanctions, McAdoo would have been eligible to play football during the 2011 fall season, his senior year. In a series of e-mails from October to early November 2010, UNC officials notified the NCAA of the outcome of Plaintiff's honor trial.

Unfortunately for McAdoo, the Committee staff disagreed with UNC's reinstatement request. The Committee staff weighed all the evidence UNC provided to make its eligibility determination. On 12 November 2010, the NCAA released a Student-Athlete Reinstatement Case Report (the "Case Report") determining Plaintiff was permanently ineligible to play intercollegiate athletics due to violations of (1) NCAA Bylaw 10.1-(b) (academic fraud); and (2) NCAA Bylaws 12.3.1.2, 16.02.3, and 16.11.2.1 (extra benefits). The Case Report stated that under NCAA regulations, Plaintiff "received impermissible assistance on multiple assignments across several academic terms." It specifically recounted the details surrounding the SWAH 403 paper.

The NCAA Committee on Student-Athlete Reinstatement maintains a clearly-outlined appeal procedure. After the Committee staff makes an initial eligibility determination, the Institution has 30 days to accept the decision or to appeal it to the full Committee. Appeals of reinstatement decisions generally involve a teleconference. According to the Committee's Policies and Procedures, "[t]he committee requires a minimum of 48 hours to review documentation prior to a teleconference appeal or prior to rendering a decision for an appeal via paper review." "For all appeals handled by the student-athlete reinstatement committee, all factual and interpretive disputes must be resolved prior to the division committee reviewing the matter." The Institution is provided with a copy of all information the Committee uses to make its decision. After the teleconference, the Committee members deliberate in private and reach a decision by

majority vote. The chair of the Committee then notifies the student-athlete reinstatement lead administrator, who in turn notifies the Institution. The Committee's determination is final.

UNC, acting on its own behalf and on behalf of McAdoo, timely appealed the staff determination to the full Committee. On 14 December 2010, the full Committee held a telephone Reinstatement Hearing (the "Hearing") with both McAdoo and UNC participating. Although UNC had its own attorney present, Plaintiff did not have independent legal representation. The NCAA, UNC, and Plaintiff were each allotted 10 minutes to make a statement, followed by questioning and 5 minute closing statements. NCAA officials made it clear the Committee was not reviewing UNC's initial determination that Plaintiff violated NCAA Bylaws, but rather its own 12 November 2010 decision not to reinstate Plaintiff's eligibility. At the beginning of the Hearing, an NCAA official further stated:

> [T]he appeal procedures require that all factual disputes must be resolved prior to the committee's review of this matter. . . . [I]f the facts appear to be in dispute the call will end since the staff's decision was made on agreed to the fact [sic] and that decision is being reviewed by this committee as an appellate body. The members of the committee have read all of the papers submitted by the Staff in the institution and are familiar with the facts of this case.

Another NCAA official then recounted the allegation of academic fraud, as initially described by UNC:

> [O]n several occasions during the 2008-09 academic year, Mr. McAdoo was assigned and worked with at least one (1) specific tutor. On several papers during this time Mr. McAdoo has admitted to receiving help from the tutor in the form of paper formatting, fixing grammatical errors and the creation of papers [sic] citations. Specific instances—number of instances—during the academic year are unknown, however, this was part of the reported violation from the institution.

The official went on to describe Wiley's assistance to Plaintiff on the SWAH 403 paper.

UNC later described how Plaintiff had only been convicted of one Honor Code violation: "One fact you should know about that is that

our honor court disagrees [with the NCAA determination]. They did not see any reason what so ever to bring a charge about improper help in AFAM 428 and they charged in AFRI 266 but found that the help was permissible."

At the Hearing, UNC also vigorously argued Plaintiff did not "knowingly" violate the NCAA bylaws:

> This is not a case, we don't believe, in which Michael actively sought out impermissible help. He was a freshman. He had no reason to think that Jennifer [Wiley] would do something different than what was appropriate. He was essentially accepting the help that Jennifer [Wiley] was offering. . . . Michael was concerned about his academic responsibility. He was worried about plagiarism and he is keeping faith with the academic mission of his time in college.

Plaintiff then presented his case and argued:

> I never thought for a second that we were ever breaking any rules. I was working hard and she was there to make sure I was on the right track. . . . My biggest concern was trying to make sure I would not plagiarize so that's why I wanted her to check all of the citations.

The Committee then considered "all of the mitigation present in this case including the institution's contention that Mr. McAdoo did not intentionally commit[] academic fraud." However, the Committee disagreed with the UNC Honor Court, concluding "Mr. McAdoo did take deliberate action and he knew what he was doing." The NCAA based its decision on the fact that:

> at some point during the full academic year that Mr. McAdoo received the impermissible academic assistance from this tutor he should have recognized that this individual was providing above and beyond what other tutors were. A fact Mr. McAdoo himself recognized at the time. When Mr. McAdoo ran short on time with an incomplete assignment he did not turn for help to the tutor to whom he had been assigned [and] instead he sought out an individual whom he know [sic] would complete the paper. Based on these factors staff believes Mr. McAdoo had culpability in this violation.

McADOO v. UNIV. OF N.C. AT CHAPEL HILL

[225 N.C. App. 50 (2013)]

In making its final decision, the Committee concluded there were no disputed factual issues requiring resolution. Based upon the evidence presented by the Committee staff and UNC, the full Committee affirmed the staff's decision to permanently disqualify McAdoo from playing college football.

In August 2011, before the start of his senior year, Plaintiff applied for and was declared eligible for the supplemental draft in the National Football League ("NFL").[3] Although Plaintiff was not drafted in the supplemental draft, he signed a contract with the Baltimore Ravens as a free agent. He received the NFL minimum yearly salary of $270,000. By signing a professional contract, McAdoo was no longer eligible to play college football. *See* NCAA Bylaw 12.2.5.

### III. Procedural History

On 1 July 2011, Plaintiff filed a verified complaint and petition for writ of mandamus, as well as a motion for preliminary injunction, against UNC, UNC's Chancellor H. Holden Thorp ("Thorp"), and the NCAA in Durham County Superior Court. On 6 July 2011, Plaintiff filed a verified amended complaint in Durham County Superior Court. In his complaints, Plaintiff alleged claims for: (1) breach of contract as to UNC; (2) breach of fiduciary duty as to UNC and Thorp; (3) breach of contract as to the NCAA and UNC; (4) negligence as to the NCAA; (5) gross negligence as to the NCAA; (6) libel as to the NCAA; (7) tortious interference with contract as to the NCAA; (8) declaratory judgment for violations of the North Carolina Constitution; (9) a mandatory injunction or writ of mandamus as to UNC and Thorp; (10) entitlement to preliminary and permanent injunctive relief as to UNC and Thorp; and (11) entitlement to preliminary and permanent injunctive relief as to the NCAA.

Plaintiff alleged he is "gifted with the physical characteristics (size, strength, speed, quickness, agility) and developed skills to enable him to compete as a football player at a very high level." Plaintiff believes if he

> [had] continue[d] to progress and improve as a football player as expected if permitted to play football at UNC in the 2011 season, there [would have been] a significant possibility that [he] would [have been] a prospective draft selection in the 2012 National Football League

---

3. The NFL's supplemental draft allows qualified underclassmen to participate in the draft when they had not requested timely entry into the regular draft.

McADOO v. UNIV. OF N.C. AT CHAPEL HILL

[225 N.C. App. 50 (2013)]

("NFL") Draft, or that [he] would [have been] signed as a free agent to play professional football following the 2011 NCAA season.

On 20 July 2011, the Durham County Superior Court entered an order denying Plaintiff's petition for writ of mandamus and motion for preliminary injunction. Defendants filed motions to dismiss on 6 September 2011. On 23 November 2011, the Durham County Superior Court entered an order dismissing the amended complaint. Plaintiff filed a timely notice of appeal on 29 November 2011.

## IV. Analysis

On appeal, Plaintiff makes two arguments: (i) the trial court erred in dismissing his case under North Carolina Rule of Civil Procedure 12(b)(6) because Plaintiff has stated claims upon which relief may be granted; and (ii) the trial court erred in granting Defendants' motions to dismiss under North Carolina Rule of Civil Procedure 12(b)(1) because his claims are justiciable. Plaintiff's claims challenge the actions of (i) UNC, and Thorp, in his official capacity as UNC's Chancellor; and (ii) the NCAA. Upon review, we affirm the trial court's decision because Plaintiff has not raised justiciable issues concerning any of these parties.

### A. UNC and Thorp

Plaintiff does not raise a justiciable issue against either UNC or Thorp under (i) the Athletics Scholarship Agreement (the "ASA") or (ii) the Instrument of Student Judicial Governance (the "Instrument").

### 1. The Athletics Scholarship Agreement

Plaintiff does not raise any justiciable issues under the ASA because: (i) he has not stated facts making out a prima facie breach of the ASA as an express contract; (ii) his alleged injury is too hypothetical and speculative to provide him with standing; and (iii) his claims are now moot.

On 6 February 2008, Plaintiff and his mother, Janai D. Shelton, signed an ASA which provided Plaintiff with full financial aid for the 2008–09 academic year covering tuition, fees, room, board and books. The ASA provides, in part, the following:

> 3. This award is not automatically renewed. Per NCAA regulations, scholarships are awarded on a one-year

basis . . . and are generally renewed for 4 academic years (pending the recommendation of the head coach at the end of each academic year), unless otherwise described above. Your eligibility for renewal of this award is subject to UNC and NCAA renewal policies at the end of the term (which include, but are not limited to, your fulfillment of UNC, ACC, and NCAA progress-toward-degree requirements).

. . . .

ACCEPTANCE *By signing this offer of financial aid, I understand that:*

1. I will become ineligible for intercollegiate competition if I receive any financial assistance other than that authorized by the NCAA and approved by the Compliance Office and the Office of Scholarships and Student Aid. It is my responsibility to make these offices aware of any outside aid for which I am eligible. I understand that my athletics scholarship may be reduced or cancelled if I receive institutional and/or outside financial aid.

. . . .

4. If I voluntarily withdraw or am suspended from UNC, my athletics scholarship will be discontinued. Reinstatement of my athletics scholarship is not guaranteed upon my return to UNC.

5. My scholarship may be reduced or cancelled at any time if I: a) become ineligible for intercollegiate competition in my sport, b) voluntarily withdraw from my sport, . . . d) engage in misconduct warranting disciplinary penalty (e.g., violate team, UNC, ACC, or NCAA regulations, am arrested for or convicted of a misdemeanor or felony, etc.).

. . . .

7. I must conduct myself in accordance with all UNC, ACC, and NCAA regulations. . . . Failure to follow these regulations may result in the cancellation of this award.

8. Any modification or cancellation of this award must be in compliance with UNC, ACC, and NCAA legislation.

Subsequently, Plaintiff applied for admission to UNC and was accepted. Per the ASA, he received a full athletic scholarship for the 2008–09 academic year. On 27 June 2008, Shirley A. Ort ("Ort"), UNC's Associate Provost and Director of the Office of Scholarships and Student Aid, sent Plaintiff a letter confirming the terms of the ASA. In addition to the financial benefits outlined above, the letter provided that because Plaintiff was a resident of Tennessee at the time of his application to UNC, he would receive in-state residency status for tuition purposes. The Ort letter re-emphasized that "your athletic scholarship may be immediately reduced or cancelled if you fail to meet UNC, ACC, or NCAA continuing eligibility requirements; become ineligible to participate in your sport; . . . or engage in misconduct warranting disciplinary penalty." Ort renewed Plaintiff's scholarship on 19 June 2009 and 30 June 2010 using similar form letters.

### i. No Breach of ASA

Plaintiff has not alleged UNC or Thorp breached the terms of the ASA.

In North Carolina, a plaintiff must allege injury to a contractual interest to have standing to maintain a contract-based claim. *See Beachcomber Props., L.L.C. v. Station One, Inc.,* 169 N.C. App. 820, 824, 611 S.E.2d 191, 194 (2005) (holding that a plaintiff had no injury in fact, and consequently no standing, when it had no enforceable contract right against the defendant).

In the present case, Plaintiff has alleged no such injury under the terms of the ASA. According to the ASA, UNC promised to pay Plaintiff's full tuition, fees, room, board, and books in exchange for his promise to, *inter alia,* "conduct [himself] in accordance with all UNC, ACC, and NCAA regulations[,]" including UNC's Honor Code and the NCAA bylaws.

Even if UNC and the NCAA correctly determined Plaintiff violated UNC regulations and the NCAA Bylaws, nothing in the record indicates UNC terminated his athletic scholarship. Rather, UNC placed Plaintiff on academic probation for one semester, suspended him for one semester, and gave him a failing grade on his SWAH 403 assignment. Thus, after examining the express contract between the parties, we conclude Plaintiff cannot show any bargained-for monetary loss under the ASA which is attributable to the acts of UNC or Thorp.

## ii. Injury Too Speculative for Standing

Any further injuries Plaintiff alleges are too hypothetical and speculative to provide him with standing.

The law of North Carolina provides:

> A party to a contract who is injured by another's breach of the contract is entitled to recover from the latter damages for . . . only such injuries as are the direct, natural, and proximate result of the breach or which, in the ordinary course of events, would likely result from a breach and can reasonably be said to have been foreseen, contemplated, or expected by the parties at the time when they made the contract as a probable or natural result of a breach.

*Bloch v. The Paul Revere Life Ins. Co.*, 143 N.C. App. 228, 237, 547 S.E.2d 51, 58 (2001) (quotation marks and citation omitted). "As part of its burden, the party seeking damages must show that the amount of damages is based upon a standard that will allow the finder of fact to calculate the amount of damages with reasonable certainty." *Olivetti Corp. v. Ames Business Systems, Inc.*, 319 N.C. 534, 547-48, 356 S.E.2d 578, 586 (1987). Therefore, speculative damages that cannot be calculated with reasonable certainty are not recoverable.

Here, McAdoo contends his damages are not limited to the loss of his scholarship because of the existence of "special damages." Specifically, he argues that had UNC, Thorp and the NCAA not breached the contract by unfairly preventing him from playing football his senior year, then his subsequent earnings as an NFL football player would have been greater than those he actually obtained as a free agent. Plaintiff's counsel, at oral arguments, stated that expert witnesses were prepared to present evidence of these "special damages."

Nonetheless, when disappointed student-athletes have presented similar arguments to courts, both in this state and elsewhere, these claims for damages have been rejected as speculative. *See Arendas v. N.C. High Sch. Athletic Ass'n*, ___ N.C. App. ___, 718 S.E.2d 198 (2011).

In *Arendas*, it was discovered that two students on a high school men's basketball team did not reside in the proper school district. *Id.* at ___, 718 S.E.2d at 199. Their school's state championship win was vacated, and they were declared ineligible to participate in high

school athletics for one year. *Id.* at ___, 718 S.E.2d at 199. Although the student-plaintiffs in *Arendas* contended "the forfeiture of the Championship *could cause* possible harm in the form of lost scholarships, lost job opportunities, and lost college prospects[,]" our Court held the students did not have standing to bring suit because "these possibilities were all hypothetical." *Id.* at ___, 718 S.E.2d at 200. Like in *Arendas*, we determine Plaintiff's alleged damages are too hypothetical and speculative to survive a motion to dismiss.

Similarly, although non-binding on this Court, other jurisdictions have rejected these types of damage claims as speculative. *See, e.g., Butler v. NCAA*, No. 06-2319 KHV, 2006 WL 2398683, at *4 (D. Kan. Aug. 15, 2006) ("Therefore, he will not suffer irreparable injury through loss of a scholarship. As for the loss of an opportunity for a professional football career, such harm is speculative."); *Colorado Seminary (University of Denver) v. NCAA*, 417 F. Supp. 885, 895 (D. Colo. 1976) ("While the Court might agree that the deprivation of a previously granted scholarship would invoke the protections of procedural due process[,] . . . the interest in future professional careers must nevertheless be considered speculative and not of constitutional dimensions."); *Bowers v. NCAA*, 118 F. Supp. 2d 494, 509-510 (D. N.J. 2000) ("[T]he road to a professional football career is long and circuitous, and [the plaintiff] has not gone down that road far enough to submit such a fanciful damage claim to a fact finder. Accordingly, [he] may not pursue damages for the loss of a potential professional athletic career.").

Furthermore, the cases cited by Plaintiff are factually distinguishable. *See Bloom v. NCAA*, 93 P.3d 621 (Colo. App. 2004); *Oliver v. NCAA*, 920 N.E.2d 203 (Ohio Ct. Com. Pl. 2009), *vacated pursuant to settlement* (Sept. 30, 2009). In *Bloom*, the plaintiff sought a declaratory judgment and injunctive relief allowing him to maintain pre-existing endorsements, modeling contracts, and media activities stemming from his Olympic-level skiing career even though he was now an NCAA football player. *Bloom*, 93 P.3d at 622. Since *Bloom's* injury arose from a dispute concerning *pre-existing* contracts, his injury was concrete and particularized. *See id.* Similarly, in *Oliver*, the plaintiff alleged an injury not to his future career, but to his present right to hire an attorney to represent his interests. *Oliver*, 920 N.E.2d at 207-08. In sum, the alleged injury in both *Bloom* and *Oliver* did not concern future career prospects and earning potential. In any event, those cases are not binding on this Court. *See Morton Buildings, Inc. v. Tolson*, 172 N.C. App. 119, 127, 615 S.E.2d 906, 912

(2005) ("[W]hile decisions from other jurisdictions may be instructive, they are not binding on the courts of this State.").

Consequently, Plaintiff's claims are non-justiciable because his alleged damages are too speculative and hypothetical to provide him with standing.

### iii. Mootness

Additionally, any claims Plaintiff makes under the terms of the ASA are now moot.

Our Supreme Court has succinctly stated the test for mootness:

> Whenever, during the course of litigation it develops that the relief sought has been granted or that the questions originally in controversy between the parties are no longer at issue, the case should be dismissed, for courts will not entertain or proceed with a cause merely to determine abstract propositions of law.

*In re Peoples*, 296 N.C. 109, 147, 250 S.E.2d 890, 912 (1978).

In North Carolina, a plaintiff's actions subsequent to the start of litigation can render the plaintiff's claims moot. For instance, in *Messer v. Town of Chapel Hill*, 346 N.C. 259, 485 S.E.2d 269 (1997), a landowner brought suit against a town for a re-zoning decision that allegedly deprived the landowner of "a practical use and a reasonable value" for his land. *Id.* at 261, 485 S.E.2d at 270 (quotation marks and citation omitted). Because the landowner later sold the land for $1,500,000, the Supreme Court determined the claim was moot. *Id.*

In the present case, Plaintiff initially made claims for money damages, declaratory judgment, and mandamus or injunctive relief. Since Plaintiff has become a professional football player with the Baltimore Ravens, under NCAA regulations he can no longer play football at an intercollegiate level.[4] Thus, Plaintiff concedes his claims for mandamus and injunctive relief to require UNC and the NCAA to declare him eligible to play intercollegiate football are now moot. Nonetheless, Plaintiff argues his claims for money damages and declaratory judgment are not moot.

---

4. NCAA Bylaw 12.2.5 provides that "[a]n individual shall be ineligible for participation in an intercollegiate sport if he or she has entered into any kind of agreement to compete in professional athletics, either orally or in writing, regardless of the legal enforceability of that agreement."

In support of this argument, Plaintiff relies on *Rug Doctor, L.P. v. Prate*, 143 N.C. App. 343, 545 S.E.2d 766 (2001). In *Rug Doctor*, this Court analyzed a case concerning an alleged violation of a non-compete agreement. *Id.* at 344, 545 S.E.2d at 767. Although the plaintiff's claim for injunctive relief in *Rug Doctor* was rendered moot because the non-compete agreement had expired by the time of adjudication, we still allowed the plaintiff to proceed on his claim for money damages. *Id.* at 346, 545 S.E.2d at 768.

Regardless of *Rug Doctor*, we conclude Plaintiff's entire case is moot because he has now effectively obtained the relief sought. *See Ballard v. Weast*, 121 N.C. App. 391, 393, 465 S.E.2d 565, 567 (1996). Plaintiff initially brought suit for money damages to compensate him for alleged injury to his future career prospects and earning potential as a professional football player. Although any specific level of injury to Plaintiff's career prospects and earning potential is too "conjectural" and "hypothetical" to estimate, it is clear that the actions of UNC, Thorp, and the NCAA did not prevent Plaintiff from pursuing a professional football career. Like in *Messer*, Plaintiff's subsequent actions indicate he effectively obtained the relief he initially sought. Because Plaintiff now plays professional football in the NFL, we find his claims to be moot.

Therefore, we determine McAdoo has not raised any justiciable claims under the ASA.

## 2. The Instrument

Plaintiff does not challenge the procedures used during or the outcome arrived at in his UNC Honor Court proceedings. Instead, the focus of Plaintiff's claims against UNC and Thorp under the Instrument is his allegation that UNC failed to follow its own procedures, as outlined in the Instrument, by prematurely reporting his violations of NCAA regulations. Because Plaintiff has not alleged an injury in fact, we conclude his claims are non-justiciable since he does not have standing to raise a claim under the Instrument. *See Neuse River Foundation, Inc.*, 155 N.C. App. at 114, 574 S.E.2d at 51-52.

In North Carolina, individuals have full due process protection against the actions of state actors, such as public universities. *See State v. Strickland*, 169 N.C. App. 193, 195-96, 609 S.E.2d 253, 254–55 (2005). A state actor violates due process when it fails to follow its own rules and procedures. *See McLean v. Mecklenburg County*, 116 N.C. App. 431, 434-35, 448 S.E.2d 137, 139 (1994) (holding a county

police civil service board violated officers' due process rights by failing to follow its own procedures in their termination proceedings).

Here, UNC is a state actor because it is a public university. *See Yan-Min Wang v. UNC-CH School of Medicine,* ___ N.C. App. ___, ___, 716 S.E.2d 646, 657 (2011) (analyzing a due process claim against UNC as a state actor). At UNC, all students are subject to the Instrument. The Instrument addresses the procedures for handling Honor Code violations and the rights of students accused of Honor Code violations. Specifically, it provides:

> It shall be the responsibility of every student enrolled at the University of North Carolina to support the principles of academic integrity and to refrain from all forms of academic dishonesty including, but not limited to, the following:
>
> 1. Plagiarism in the form of deliberate or reckless representation of another's words, thoughts, or ideas as one's own without attribution in connection with submission of academic work, whether graded or otherwise.
>
> . . . .
>
> 3. Unauthorized assistance or unauthorized collaboration in connection with academic work, whether graded or otherwise.
>
> 4. Cheating on examinations or other academic assignments, whether graded or otherwise, including but not limited to the following:
>
> a. Using unauthorized materials and methods (notes, books, electronic information, telephonic or other forms of electronic communication, or other sources or methods), or
>
> b. Representing another's work as one's own.

According to section IV(A) of the Instrument, accused students have, *inter alia,* "[t]he right to be presumed innocent until proven guilty," "[t]he right to a fair, impartial, and speedy hearing," and "[t]he right to have an alleged offence proven beyond a reasonable doubt[.]" We conclude Plaintiff fails to allege facts showing UNC did not follow the Instrument's provisions.

Plaintiff contends UNC failed to comply with the Instrument when it reported his violation of NCAA bylaws before Plaintiff's Honor Court trial had occurred. Specifically, Plaintiff argues in his appellate brief that he was not afforded his rights, as guaranteed by section IV(A) of the Instrument:

> (a) to be made aware of the charges against him and the possible sanctions; (b) to present a defense; (c) the presumption of innocence until proven guilty; (d) to a fair and impartial hearing; (e) to know the evidence and witnesses to be used against him and the right to confront these witnesses; and (f) to have an offense proven beyond a reasonable doubt.

However, Plaintiff does not raise a justiciable issue because he has not alleged an injury in fact. *See Neuse River Foundation, Inc.*, 155 N.C. App. at 114, 574 S.E.2d at 51–52. As denoted in section IV(A) of the Instrument, students' rights only attach to "violation[s] of the [UNC] Honor Code." Plaintiff does not argue UNC breached the Instrument in its handling of his Honor Code violations. Additionally, nothing in the Instrument addresses students' rights when accused of violating NCAA regulations. In fact, the ASA, an express contract between McAdoo and UNC, clearly established that the NCAA's requirements are distinct from UNC's requirements. For example, the UNC Honor Court did not involve itself with Plaintiff's receipt of benefits from a sports agent. Plaintiff, however, erroneously conflates UNC's requirements with the NCAA's requirements.

McAdoo argues that as a governmental agency, UNC is bound by due process requirements to follow the Instrument's procedures when meeting its NCAA obligations. We do not agree. While every citizen is guaranteed due process when a governmental institution is involved, here Plaintiff does not allege UNC or Thorp violated his due process rights when disciplining him for his Honor Code violation. UNC followed its own rules, as outlined in the Instrument, in handling McAdoo's Honor Court trial.

Furthermore, UNC also complied with NCAA regulations in reporting potential NCAA violations. In its petition to reinstate McAdoo's eligibility, UNC only referenced violations of NCAA bylaws. It specifically mentioned Bylaws 16.02.3, 16.11.2.1, and 12.3.1.2 (extra benefits) and 10.1-(b) (academic misconduct). In fact, UNC explicitly told the NCAA:

[T]he facts surrounding the academic fraud have been submitted to the UNC Honor Court to be processed according to their policies for all students. Unfortunately, given the student-run nature of that system and the procedural steps that must be taken, it is unlikely that the case will be resolved until early November. . . . If we receive any additional information from the Honor Court prior to your determination, we will promptly provide it to you for consideration in this matter.

Under NCAA rules, UNC had a duty to report conduct which it concluded constituted a violation of NCAA regulations. These duties are independent of the Instrument's requirements. We agree that conduct prohibited by UNC and the NCAA may overlap, but the process required for violations of the Instrument is not required for compliance with an Institution's duties under the NCAA constitution and bylaws. Consequently, we conclude Plaintiff does not raise a justiciable issue against UNC and Thorp because he does not allege facts showing they violated his due process rights by failing to comply with the terms of the Instrument.

## B. The NCAA

Plaintiff alleges (i) the NCAA violated its own rules by failing to stop the Hearing when a factual dispute arose; (ii) the NCAA acted arbitrarily by determining multiple violations of NCAA Bylaw 10.1-(b) occurred; and (iii) the NCAA acted arbitrarily by determining McAdoo "knowingly" violated NCAA Bylaw 10.1-(b). We conclude Plaintiff does not raise a justiciable issue under any of these theories.

In North Carolina, "[i]t is well established that courts will not interfere with the internal affairs of voluntary associations." *Wilson Realty & Constr., Inc. v. Asheboro-Randolph Bd. of Realtors, Inc.,* 134 N.C. App. 468, 470, 518 S.E.2d 28, 30 (1999) (citing 6 Am. Jur. 2d *Associations and Clubs* § 37 (1963)). "[W]here the duly adopted laws of a voluntary association provide for the final settlement of disputes among its members, by a procedure not shown to be inconsistent with due process, its action thereunder is final and conclusive and will not be reviewed by the courts in the absence of arbitrariness, fraud, or collusion." *Topp v. Big Rock Foundation, Inc.,* ___ N.C. App. ___, ___, 726 S.E.2d 884, 889 (quoting *Lough v. Varsity Bowl, Inc.,* 243 N.E.2d 61, 63 (Ohio 1968)) (quotation marks omitted) (alteration in original).

Thus, under the *Topp* test, when a plaintiff challenges a voluntary organization's decision, the case will be dismissed as non-justiciable unless the plaintiff alleges facts showing (i) the decision was "inconsistent with due process," or (ii) the organization engaged in "arbitrariness, fraud, or collusion." *Id.*

Private voluntary organizations are not required to provide their members with the full substantive and procedural due process protections afforded under the United States and North Carolina constitutions. *See Gaston Bd. of Realtors, Inc. v. Harrison*, 64 N.C. App. 29, 36, 306 S.E.2d 809, 813–14 (1983) (Johnson, J., dissenting) ("[I]n the case of private associations, such an interpretation would give rise to serious constitutional questions regarding freedom of association under the First and Fourteenth Amendments to the United States Constitution."), *rev'd for reasons stated in dissent*, 311 N.C. 230, 316 S.E.2d 59 (1984); *NCAA v. Tarkanian*, 488 U.S. 179, 191 (1988) ("Embedded in our Fourteenth Amendment jurisprudence is a dichotomy between state action, which is subject to scrutiny under the Amendment's Due Process Clause, and private conduct, against which the Amendment affords no shield, no matter how unfair that conduct may be." (footnote omitted)(citation omitted)).

Rather, they must only (i) follow their own internal rules and procedures, and (ii) adhere to principles of "fundamental fairness" by providing notice and an opportunity to be heard. *See Gaston Bd. of Realtors, Inc.*, 311 N.C. at 237, 316 S.E.2d at 63 ("[T]he charter and bylaws of an association may constitute a contract between the organization and its members wherein members are deemed to have consented to all reasonable regulations and rules of the organization."); *Topp*, ___ N.C. App. at ___, 726 S.E.2d at 889 ("[A] voluntary association's decision may also be overturned if it did not afford the complaining party procedural due process (notice and an opportunity to be heard).").

Whether a voluntary organization's decision is arbitrary, fraudulent, or collusive is a question of law "equate[d] . . . with an abuse of discretion standard." *Id.* "Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988); *see also White v. White*, 312 N.C. 770, 777, 324 S.E.2d 829, 833 (1985) ("A trial court may be reversed for abuse of discretion only upon a showing that its actions are manifestly unsupported by reason . . . [and] upon a show-

ing that [the trial court's decision] was so arbitrary that it could not have been the result of a reasoned decision.").

In the present case, however, we need not apply the *Topp* test to analyze the substance of Plaintiff's claims against the NCAA because, as discussed *supra*: (i) Plaintiff does not have standing to raise his claims; and (ii) his claims are now moot. Plaintiff lacks standing to bring claims against the NCAA because the alleged injury to his future football career is too speculative. *See Arendas*, ___ N.C. App. at ___, 718 S.E.2d at 200. Furthermore, his case against the NCAA is moot because he effectively obtained the relief sought when he signed a contract to play professional football with the Baltimore Ravens. *See Peoples*, 296 N.C. at 147, 250 S.E.2d at 912. Consequently, we determine the trial court did not err in dismissing his claims against the NCAA because his claims are non-justiciable.

## V. Conclusion

We conclude from this review that McAdoo has not raised justiciable claims. First, McAdoo has not sustained any "injury in fact" because his scholarship was never terminated. Second, Plaintiff has accomplished the goal he sought to achieve—playing in the NFL. Finally, the remedies the plaintiff seeks, both in compensation and declaratory judgment, are hypothetical in nature. Consequently, we affirm the trial court's order dismissing Plaintiff's case.

AFFIRMED.

Judges ERVIN and McCULLOUGH concur.