Doctors Making Housecalls-Internal Med., P.A. v. Onsite Care, PLLC, 2019 NCBC 5.

STATE OF NORTH CAROLINA

DURHAM COUNTY

DOCTORS MAKING
HOUSECALLS-INTERNAL
MEDICINE, P.A.,

              Plaintiff,

v.

ONSITE CARE, PLLC,

              Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18 CVS 2095

**ORDER AND OPINION ON
PLAINTIFF'S MOTION TO DISMISS
COUNTERCLAIMS**

THIS MATTER comes before the Court on Plaintiff Doctors Making Housecalls-Internal Medicine, P.A.'s Motion to Dismiss Counterclaims ("Motion", ECF No. 16).

THE COURT, having considered the Motion, the briefs filed in support of and in opposition to the Motion, the arguments of counsel at the hearing, and other appropriate matters of record, CONCLUDES that the Motion should be GRANTED, in part, and DENIED, in part, in the manner and for the reasons set forth below.

> *Brooks, Pierce, McLendon, Humphrey & Leonard LLP, by Craig D. Schauer, Jeffrey E. Oleynik, Justin N. Outling, and Shana L. Fulton, for Plaintiff Doctors Making Housecalls-Internal Medicine, P.A.*
>
> *Ellis & Winters LLP, by Kelly Margolis Dagger, Jonathan Berkelhammer, and Jeremy Falcone, for Defendant Onsite Care, PLLC.*

McGuire, Judge.

### I.    FACTS AND PROCEDURAL BACKGROUND

1.    The Court does not make findings of fact on motions to dismiss under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure (hereinafter, the North

Carolina Rules of Civil Procedure will be referred to as "Rule(s)"). In this case, the Court only recites those facts included in the Counterclaims portion of Defendant's Answer and Counterclaims that are relevant to the Court's determination of the Motion. All facts herein are drawn from the allegations in Defendant's counterclaims ("CC"). (Answ. and Countercl., ECF No. 4 at CC, pp. 13–32.)

2. Plaintiff Doctors Making Housecalls-Internal Medicine, P.A. ("Plaintiff") is a North Carolina professional limited liability company with its principal place of business in Durham.

3. Defendant Onsite Care, PLLC ("Defendant") is a North Carolina professional limited liability company with its principal place of business in Mecklenburg County.

4. Plaintiff and Defendant are competitors in the market for providing on-premises care to residents of adult care homes. An adult care home is statutorily defined in North Carolina as:

> [a]n assisted living residence in which the housing management provides 24-hour scheduled and unscheduled personal care services to two or more residents, either directly or for scheduled needs, through formal written agreement with licensed home care or hospice agencies. Some licensed adult care homes provide supervision to persons with cognitive impairments whose decisions, if made independently, may jeopardize the safety or well-being of themselves or others and therefore require supervision.

N.C. Gen. Stat. § 131D-2.1(3) (hereinafter the North Carolina General Statutes are referred to as "G.S."). The type of adult care homes to which Plaintiff and Defendant provide services are known in the industry as assisted living facilities

("ALF"). (ECF No. 4 at CC, ¶¶ 3, 10, 11.)

5. ALFs do not provide medical and nursing services to their residents. Instead, ALF residents typically receive medical care from outside providers like Plaintiff or Defendant. (*Id*. at ¶ 12.) The relationship between the ALFs, the residents, and the outside providers is regulated by the State of North Carolina. (*Id*. at ¶¶ 14–19; see 10A N.C.A.C. 13F .0201 et seq.) However, the resident, or the person responsible for them, must be permitted to choose the residents' health care provider. (ECF No. 4 at CC, ¶ 16; 10A N.C.A.C. 13F .0902(d)(1) ("The resident or the resident's responsible person shall be allowed to choose a physician or physician service to attend the resident."); 10A N.C.A.C. 13F .0902(d)(2) ("When the resident cannot remain under the care of the chosen physician or physician service, the facility shall assure that arrangements are made with the resident or responsible person for choosing and securing another physician or physician service within 45 days[.]").)

6. Plaintiff and Defendant both market their services directly to ALFs. (ECF No. 4 at CC, ¶ 22.) Though the resident is entitled to make the decision on whom to retain as their provider, "being a facility's 'preferred provider' plays a significant role in the provider a resident chooses." (*Id*.)

7. The State of North Carolina is the geographic market in which Plaintiff and Defendant compete. (*Id*. at ¶¶ 23–25.) Plaintiff is the largest provider of medical services to ALFs in North Carolina. (*Id*. at ¶ 4.) Plaintiff provides care to residents in over 250 of the 593 ALFs in the North Carolina market, or

approximately 42% of the ALFs.  (*Id*. at ¶¶ 26–27.)  Defendant alleges that the ALFs to which Plaintiff provides care "are disproportionately larger facilities with greater numbers of residents[,]" resulting in Plaintiff providing services to at least, but likely more than, 42% of the total market share.  (*Id*. at ¶ 27.)

A.  *The Wellington Park Lawsuit and Complaint to the NC Board of Nursing*

8.    From late 2016 until in or about January 2018, Plaintiff had a preferred provider relationship with Wellington Park, an ALF in Kenansville, North Carolina.  (*Id*. at ¶¶ 47–51.)  In December 2017, Defendant "began discussions with Wellington Park to become the preferred provider at the facility."  (*Id*. at ¶ 51.)  By January 20, 2018, forty-seven of the sixty-five residents of Wellington Park had executed written consent forms to transfer their medical care from Plaintiff to Defendant.  (*Id*. at ¶ 56.)  Wellington Park informed Plaintiff that its residents would transfer care to Defendant.  (*Id*. at ¶ 54.)

9.    In response, Plaintiff through its attorneys "sent threatening communications to Wellington Park."  (*Id*. at ¶ 55.)  Wellington Park provided Plaintiff with documentation reflecting the residents' choice to transfer their care.  (*Id*. at ¶ 57.)  Nevertheless, on January 31, 2018, Plaintiff filed a lawsuit against Defendant and Wellington Park alleging tortious interference with contract, tortious interference with prospective contracts, civil conspiracy, and unfair and deceptive trade practices in violation of the North Carolina Unfair or Deceptive Trade Practices Act, G.S. § 75-1.1 ("UDTPA"), and seeking preliminary injunctive relief ("Wellington Park Lawsuit").  (*Id*. at ¶ 57; Wellington Park Compl., ECF No. 4

at Ex. E.) In the Wellington Park Lawsuit, Plaintiff alleged that the residents "lacked capacity to transfer their care." (ECF No. 4 at CC, ¶ 58.)

10. On February 2, 2018, the Honorable Judge Allen Baddour entered a Temporary Restraining Order ("TRO") granting Plaintiff a "limited portion of the relief it requested." (*Id*. at ¶ 59; TRO, ECF No. 17.1 at Attach. 3.) The TRO permitted Defendant to continue to provide care to those Wellington Park residents to whom Defendant had already provided care as of February 2, 2018. (ECF No. 4 at CC, ¶ 59; ECF No. 17.1 at Attach. 3, p. 2.) For every resident who had not yet been seen by Defendant as of February 2, 2018, "the Court required that a capacity determination be made and documented by a medical professional." (ECF No. 4 at CC, ¶ 59.) The TRO stated that it would be effective until 5:00 p.m. on February 12, 2018, and required Plaintiff to post a bond in the amount of $1,000.00. (ECF No. 17.1 at Attach. 3, p. 3.)

11. Plaintiff never posted the bond required by the TRO. (ECF No. 4 at CC, ¶ 65.) No hearing was held on Plaintiff's motion for a preliminary injunction.

12. Plaintiff subsequently entered into a settlement agreement with Wellington Park ("the Settlement"). Defendant was not part of the settlement of the Wellington Park Lawsuit. (*Id*. at ¶ 68.) Under the Settlement, the Regional Ombudsman visited Wellington Park to determine whether the residents had made an "informed decision" to transfer care to Defendant. (*Id*. at ¶ 68.) The Ombudsman was not tasked with determining whether the residents were legally competent to make the transfer of care decision, and did not make any

determinations regarding capacity or competency. (*Id.* at ¶¶ 68, 70.) On February 23, 2018, Plaintiff voluntarily dismissed the Wellington Park Lawsuit. (*Id.* at ¶ 64.)

13. On April 3, 2018, Plaintiff initiated this lawsuit against Defendant only, making claims for tortious interference with resident contracts, tortious interference with prospective contracts or economic advantage, violation of the UDTPA, tortious interference with employment agreement, and punitive damages. (*Id.* at ¶ 71; Compl.)

14. Sometime after February 12, 2018, Plaintiff filed a complaint with the North Carolina Board of Nursing ("Nursing Board") against Ms. Williams-Corbin, a provider employed by Defendant and a former employee of Plaintiff, claiming that she had treated a Wellington Park resident on February 17 and 18, 2018, in violation of the TRO. (ECF No. 4 at CC, ¶ 66.) After an investigation, the Nursing Board resolved the complaint in favor of Williams-Corbin. (*Id.* at ¶ 67.) Defendant does not allege that any complaint was filed against Defendant with the Nursing Board, nor that Defendant played any part in obtaining the favorable outcome for Williams-Corbin.

### B. *The Scheme to Monopolize the Market*

15. Defendant alleges that the Wellington Park Lawsuit and this action are part of a series of baseless lawsuits Plaintiff has filed against ALFs and Plaintiff's competitors in an attempt to chill the ALFs from recommending that its residents transfer their medical care to Defendant or to Plaintiff's other competitors. (ECF No. 4 at CC, ¶¶ 5, 29.) In these lawsuits, Plaintiff makes

"vague, conclusory allegations" that the residents of the ALF lack the mental capacity to make the decision to change medical providers and have been "coerced or mislead [sic] in to switching to the new provider." (*Id.* at ¶¶ 6, 32.) Defendant alleges that Plaintiff's "pattern of baseless litigation constitutes a scheme to monopolize the market for medical care at [ALFs]." (*Id.* at ¶ 7.) Filing these lawsuits "is intended to dissuade [ALFs] from engaging other medical providers to provide care to their residents out of fear that [Plaintiff] will file costly litigation against them." (*Id.* at ¶ 8.) Defendant alleges that Plaintiff's "conduct has the potential to chill competition in the relevant market, which harms [Defendant] by foreclosing competitive opportunities and harms consumers in the form of lower quality medical care and increased prices." (*Id.* at ¶ 9.)

16. In addition to the Wellington Park Lawsuit and this action, Plaintiff has filed at least six other lawsuits since February 2014 alleging claims identical to those raised in the Wellington Park Lawsuit and this action. (*Id.* at ¶¶ 36–45, 72–80; Exs. A–D, F–H.) Three of these other lawsuits were brought against an ALF, although not against Defendant, after the ALF attempted to switch their preferred provider from Plaintiff to Defendant. (*Id.* at ¶¶ 74–75, 78; ECF No. 4 at Exs. F, G, H.)

17. Defendant alleges that Plaintiff has been able to protect and increase its share of the market for providing medical services to the residents of ALFs because its threats of litigation, and the filing of "sham litigation," coerce and

intimidate ALFs from attempting to secure alternative medical providers. (ECF No. 4 at CC, ¶ 81.) Defendants allege that Plaintiff's conduct:

    a. "may dissuade risk-averse [ALFs] from working with alternative medical providers[,]" (*Id.*);

    b. "is designed to and has the purpose of raising the cost of switching to other providers such that that facilities will refrain from switching to a new preferred provider even in the face of low quality care[,]" (*Id.* at ¶ 82);

    c. "may dissuade facilities from attempting to move away from [Plaintiff] even when they are unhappy with [Plaintiff]'s services[,]" (*Id.* at ¶ 83);

    d. "depresses competition on quality of care in the relevant market . . . . [and] facilities may hesitate to recommend other providers out of fear of the burdensome costs of litigating against an aggressive adversary like" Plaintiff [,]" (*Id.* at ¶ 84);

    e. "has also allowed [Plaintiff] to raise prices in the relevant market[ ] [because] [Plaintiff] charges an additional trip fee on top of the normal Medicare and Medicaid reimbursement rate, not covered by those programs, for unscheduled visits and visits to facilities where [Plaintiff] serves less than four patients." (*Id.* at ¶ 85.)

18. On June 15, 2018, Defendant filed its Answer and Counterclaim. Defendant raises counterclaims for attempted monopolization in violation of G.S.

§ 75-2.1 (*Id*. at ¶¶ 87–91); unfair trade practices in violation of G.S. § 75-1.1 (*Id*. at ¶¶ 92–95); abuse of process (*Id*. at ¶¶ 96–106): and declaratory judgment (*Id*. at ¶¶ 107–13).

19.     On August 17, 2018, Plaintiff filed the Motion, and a Brief in Support of Motion to Dismiss Counterclaim. (Br. Supp. Mot. Dismiss CC, ECF No. 17.) Plaintiff moves to dismiss Defendant's counterclaims pursuant to Rules 12(b)(1) and 12(b)(6) "for lack of standing and failure to state a claim upon which relief can be granted." (ECF No. 16, at p. 1.)  On October 15, 2018, Defendant filed a Brief in Opposition to Motion to Dismiss Counterclaim.  (ECF No. 30.)  Plaintiff filed a Reply in Support of the Motion on October 29, 2018.  (ECF No. 31.)  The Court held a hearing on the Motion at which counsel presented oral arguments, and the Motion is now ripe for determination.

## II.     ANALYSIS

20.     Plaintiff purports to seek dismissal of the Counterclaims under both Rules 12(b)(1) and (b)(6).  However, Plaintiff does not rely on any matters outside of the pleadings in support of its arguments.  Accordingly, the Court determines the Motion under Rule 12(b)(6) based on the allegations in and documents incorporated in the Counterclaims. *Dicesare v. Charlotte-Mecklenburg Hosp. Auth.*, 2017 NCBC LEXIS 33, at *20 (N.C. Super. Ct. Apr. 11, 2017) (holding that although motion to dismiss was brought under Rules 12(b)(1) and 12(b)(6), "[a]s the pleadings are the only matters of record before the Court relevant to the Motion to Dismiss, the Motion to Dismiss is properly considered under Rule 12(b)(6)'s standard of review").

21. In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court's inquiry is "whether, as a matter of law, the allegations of the [Counterclaims,] treated as true are sufficient to state a claim upon which relief may be granted under some legal theory, whether properly labeled or not." *Harris v. NCNB Nat'l Bank*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987). Dismissal pursuant to Rule 12(b)(6) is proper when (1) the counterclaim on its face reveals that no law supports the counterclaim-plaintiff's claim; (2) the counterclaim on its face reveals the absence of facts sufficient to make a good claim; or (3) the counterclaim discloses some fact that necessarily defeats the counterclaim-plaintiff's claim. *Corwin v. British Am. Tobacco PLC*, 2018 N.C. LEXIS 1035, at *18–19 (2018). This standard of review for Rule 12(b)(6) is the standard our Supreme Court "uses routinely . . . in assessing the sufficiency of [allegations] in the context of complex commercial litigation." *Id.* at *19 n.7. Where the pleading refers to and depends on certain documents, the Court may consider those documents in deciding a motion under Rule 12(b)(6). *Schlieper v. Johnson*, 195 N.C. App. 257, 261, 672 S.E.2d 548, 551 (2009).

22. The Court construes the counterclaims liberally and accepts all allegations as true. *Laster v. Francis*, 199 N.C. App. 572, 577, 681 S.E.2d 858, 862 (2009). However, the Court is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274, 620 S.E.2d 873, 880 (2005).

*A. Defendant's Counterclaim for Attempted Monopolization*

23.     Plaintiff seeks dismissal of Defendant's counterclaim for attempted monopolization in violation of G.S. § 75-2.1.   Section 75-2.1 provides, "[i]t is unlawful for any person to monopolize, or attempt to monopolize, or combine or conspire with any other person or persons to monopolize, any part of trade or commerce in the State of North Carolina."

24.     "[T]o demonstrate attempted monopolization a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993); *see also Sitelink Software, LLC v. Red Nova Labs, Inc.*, 2016 NCBC LEXIS 45, at *29 (N.C. Super. Ct. June 14, 2016) ("To prevail on an attempted monopolization claim, Plaintiffs must demonstrate (1) a specific intent to monopolize a relevant market; (2) predatory or anticompetitive acts; and (3) a dangerous probability of successful monopolization." (*quoting R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362, 394 (M.D.N.C. 2002))).

25.     Defendant alleges that Plaintiff "has engaged in predatory conduct by abusing the judicial and administrative processes to inflict harm on competitors and dissuade facilities from engaging other providers."   (ECF No 4 at CC, ¶ 88.) Defendant further alleges that Plaintiff has "acted with the specific intent to monopolize," and "has a dangerous probability of succeeding in its scheme to acquire monopoly power." (*Id.* at ¶¶ 89–90.)

26.     Plaintiff argues that the Court should dismiss Defendant's claim for attempted monopolization because: (1) Defendant lacks standing to pursue the claim because Defendant has not alleged an actual injury; (2) Defendant's allegations are insufficient to overcome the *Noerr-Pennington* doctrine protection which generally shields the filing of lawsuits from being the basis for an antitrust claim; and (3) Defendant has not stated a claim for attempted monopolization. (ECF No. 17, at pp. 8–18.)  Since the Court concludes that Defendant does not allege an actual injury upon which standing can be grounded, it need not address Plaintiff's second and third argument and discusses only the first.

27.     The Court of Appeals has held that

> Standing is among the 'justiciability doctrines' developed by federal courts to give meaning to the United States Constitution's 'case or controversy' requirement. U.S. Const. Art. 3, § 2. The term refers to whether a party has a sufficient stake in an otherwise justiciable controversy so as to properly seek adjudication of the matter. The 'irreducible constitutional minimum' of standing contains three elements: (1) 'injury in fact' -- an invasion of a legally protected interest that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Neuse River Found. v. Smithfield Foods, Inc.*, 155 N.C. App. 110, 114, 574 S.E.2d 48, 51–52 (2002) (citations omitted).  Defendant has the burden of establishing standing to bring its Counterclaims.  *Cherry v. Wiesner*, 245 N.C. App. 339, 781 S.E.2d 871, 876 (2016).

28.    "In North Carolina, the injury in fact must be particularized and actual, not hypothetical or conjectural." *Arendas v. N.C. High Sch. Ath. Ass'n*, 217 N.C. App. 172, 175, 718 S.E.2d 198, 200 (2011); *see also McAdoo v. Univ. of N.C. at Chapel Hill*, 225 N.C. App. 50, 66, 736 S.E.2d 811, 822 (2013)  (affirming dismissal and citing *Arendas*, where "Plaintiff's alleged damages are too hypothetical and speculative to survive a motion to dismiss").  While "[i]t is not necessary that a party demonstrate that injury has already occurred," the party must at least allege "immediate or threatened injury . . . for purposes of standing." *Mangum v. Raleigh Bd. of Adjustment*, 362 N.C. 640, 642–43, 669 S.E.2d 279, 282 (2008) (internal quotation marks and citation omitted).  Furthermore, "[t]he Court is not required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sitelink Software, LLC*, 2016 NCBC LEXIS 45, at * 17.

29.    Defendant alleges that Plaintiff's conduct in filing the sham lawsuits has "injured" Defendant, (ECF No. 4 at CC, ¶ 91), but other allegations in the Counterclaims belie the claim that any party, including Plaintiff, has been injured by Defendant at this time.  To the contrary, Defendant's allegations support the conclusion that whether any party has been or will be injured by Plaintiff's conduct is completely speculative.  Defendants allege that Plaintiff's "conduct *has the potential* to chill competition in the relevant market, which harms [Defendant] by foreclosing competitive opportunities." (*Id.* at ¶ 9 (emphasis added).)  However,

Defendant does not identify any specific opportunity it has lost, or which it faces the imminent threat of losing, as a result of Plaintiff's conduct.

30.     Similarly, Defendant's allegations of other injuries resulting from Plaintiff's filing of sham lawsuits against it and other health care providers are purely speculative or conjectural.  Defendant alleges that:

a.   Plaintiff's "threats of litigation *may dissuade* risk-averse assisted living facilities from working with alternative medical providers" (*Id*. at ¶ 81 (emphasis added).)  Defendant, however, does not allege that any ALF has refused to work with Defendant or any other health care provider because it feared litigation with Plaintiff;

b.   Plaintiff files the lawsuits "*for the purpose of interfering with competitors like [Plaintiff].*"  (*Id*. at ¶ 81 (emphasis added).)  Nevertheless, Defendant does not allege that Plaintiff's lawsuits have actually interfered with Defendant's own, or any specific competitor's, ability to contact and negotiate with ALFs that currently have a relationship with Plaintiff;

c.   Plaintiff's conduct "*may dissuade [ALF]s from attempting to move away from [Plaintiff]* even when they are unhappy with [Plaintiff]'s services," and ALFs "*may hesitate* to recommend other providers out of fear of the burdensome costs of litigating against an aggressive adversary like [Plaintiff]."  (*Id*. at ¶¶ 83–84 (emphasis added).)  Again, Defendant does not allege that Plaintiff's lawsuits have caused an ALF to decide to cease

negotiations with, or not select, Defendant as a preferred provider for its services.

31. Far from alleging the "distinct and palpable" injury necessary to confer standing, Defendant alleges only that Plaintiff's conduct could hypothetically cause injury to Defendant and other competitors by making ALFs unwilling to consider services competitive to Plaintiff's. *Coker v. DaimlerChrysler Corp.,* 172 N.C. App. 386, 391–92, 617 S.E.2d 306, 310 (2005). The facts pleaded do not support an allegation that Plaintiff's conduct has, or is about to have, such an impact on competition in the marketplace.

32. Defendant contends that it has adequately alleged actual injury by pleading in paragraph 91 of the Counterclaims that "[Plaintiff's] conduct proximately injured [Defendant] in an amount to be proven at trial." (ECF No. 30, at pp. 7–8.) The allegation, however, is conclusory, and the Court is not required to accept the allegation as true in the absence of supporting facts. *Sitelink Software, LLC*, 2016 NCBC LEXIS 45, at *17. Defendant has not alleged such supporting facts.

33. Defendant also cites to several other allegations in the Counterclaims, including those discussed in paragraph 30, above, to contend that it has stated something more than speculative or potential injuries resulting from Plaintiff's conduct. (ECF No. 30, at p. 7.) Again, the allegations cited by Defendant are couched in speculative or conjectural language. For example, Defendant cites paragraphs 5–9 of the Counterclaims in support of the contention that it has alleged

Plaintiff's "anti-competitive conduct is intended to, and does, have a chilling effect on competition." (*Id.*) A close review of those allegations, however, reveals that while Defendant alleges that Plaintiff's conduct "is intended to dissuade [ALFs] from engaging other medical providers to provide care to their residents out of fear that [Plaintiff] will file costly litigation against them," Defendant does not allege that the conduct has had its intended effect, but only that it "*has the potential to chill competition in the relevant market.*" (ECF No. 4 at CC, ¶¶ 5, 9 (emphasis added).)

34.    The facts alleged in the Counterclaims do not support an allegation that Defendant or any other market competitor has suffered a concrete and particularized injury in fact that would confer standing on Defendant to pursue its claim for attempted monopolization. *Neuse River Found.*, 155 N.C. App. at 114, 574 S.E.2d at 51–52.[1] Therefore, the Court concludes that to the extent the Motion seeks dismissal of Defendant's first counterclaim for attempted monopolization in violation of G.S. § 75-2.1, the Motion should be GRANTED. However, since the Defendant's failure to allege actual injury may be the product of imprecise drafting and Defendant has, in fact, suffered injury, the Court will dismiss this claim without prejudice.

---

[1] The Court also notes that, despite the opportunity to submit evidence in response to Plaintiff's challenge to their standing, by affidavit or otherwise, Defendant failed to do so. For example, Defendant has not provided evidence that an ALF has informed Defendant that it is unwilling to discuss recommending Defendant's services to the ALF's residents, or that other competitors have been dissuaded from pursuing a business opportunity with an ALF because of fear that Plaintiff will file suit.

*B. Defendant's Counterclaim for Unfair Trade Practices*

35. Plaintiff also moves for dismissal of Defendant's second counterclaim for unfair trade practices in violation of G.S. § 75-1.1. Defendant relies on the same allegations in support of the claim for unfair trade practices that underlie the claim for attempted monopolization. (ECF No. 4 at CC, ¶¶ 92–95.) This Court has held that "[w]hen a section 75-1.1 claim derives solely from an antitrust claim, the failure of the antitrust claim also defeats liability under section 75-1.1." *Sitelink Software, LLC*, 2016 NCBC LEXIS 45, at \*32 (dismissing claim for unfair trade practices based on dismissal of the plaintiff's claims under G.S. §§ 75-1, 75-2, and 75-2.1).

36. Accordingly, because the Court has dismissed Defendant's counterclaim for attempted monopolization based on the same allegations that support the counterclaim for unfair trade practices, the counterclaim for unfair trade practices in violation of G.S. 75-1.1 should also be dismissed, and the Motion should be GRANTED, but based on the Court's dismissal of the underlying attempted monopolization claim without prejudice, the claim for unfair trade practices also should be dismissed without prejudice.

*C. Defendant's Counterclaim for Abuse of Process*

37. Defendant attempts to allege a counterclaim for abuse of process. (ECF No. 4 at CC, ¶¶ 96–106.) The basis for Defendant's claim is not clear.

38. To state a claim for abuse of process, the plaintiff must show (1) "an ulterior motive" and (2) "an act in the use of the legal process not proper in the

regular prosecution of the proceeding[.]" *Chidnese v. Chidnese*, 210 N.C. App. 299, 310, 708 S.E.2d 725, 734 (2011) (quotation and original alteration omitted). It is well established that

> [t]he ulterior motive requirement is satisfied when the plaintiff alleges that the prior action was initiated by defendant or used by him to achieve a collateral purpose not within the normal scope of the process used. The act requirement is satisfied when the plaintiff alleges that once the prior proceeding was initiated, the defendant committed some willful act whereby he sought to use the existence of the proceeding to gain advantage of the plaintiff in respect to some collateral matter.

*Stanback v. Stanback*, 297 N.C. 181, 201, 254 S.E.2d 611, 624 (1979) (internal quotations and citations omitted). "The gravamen of a cause of action for abuse of process is the improper use of the process *after it has been issued*. As a result, there is no abuse of process where it is confined to its regular and legitimate function in relation to the cause of action stated in the complaint." *Chidnese*, 210 N.C. App. at 311, 708 S.E.2d at 735 (punctuation alterations, quotations and citations omitted; emphasis in original).

39. Defendant alleges that Plaintiff "initiated the Wellington Park [L]awsuit for the improper purpose of deterring [Defendant] from legitimately competing with" Plaintiff, and subsequently obtained the TRO on February 2, 2018. (ECF No. 4 at CC, ¶¶ 96–97.) Plaintiff later filed the complaint with the Nursing Board against Williams-Corbin, claiming that she had treated residents of Wellington Park on February 17 and 18, 2018, in violation of the TRO despite the fact that Plaintiff "knew it had not paid the required bond and therefore knew that

the [TRO] was without effect" and "knew that the [TRO] nevertheless would have expired on its own terms on February 12, 2018." (*Id.* at ¶¶ 99–100.) Plaintiff "used the existence of the [TRO] to gain an advantage over [Defendant] by using it as a basis for filing a complaint against [Defendant]'s employee with the [Nursing Board.]" (*Id.* at ¶ 102.)

40. Defendant's allegations leave uncertain whether it claims the abuse of process is based upon Plaintiff filing of the Wellington Park Lawsuit, obtaining the TRO, or filing the Nursing Board complaint. To the extent Defendant attempts to allege that Plaintiff obtained the TRO for the improper purpose of later using it as the grounds for filing the Nursing Board complaint, Defendant does not allege that Plaintiff knew or could have known that one of Defendant's employees would violate the TRO. To the contrary, the allegations support the conclusion that Plaintiff sought and obtained the TRO for a proper purpose: to prevent Defendant from obtaining further consents from Wellington Park's residents until the Court could determine whether the consents already signed were properly obtained by Defendant.

41. The Court is skeptical that Defendant has stated a claim for abuse of process based upon the pleaded facts. Nevertheless, the Court need not decide this issue because the abuse of process claim fails for a different reason.

42. Plaintiff argues that the abuse of process claim should be dismissed for lack of standing because Defendant has not pleaded facts to support the allegation that it was injured by the filing of the Nursing Board complaint. (ECF No. 17, at

p. 21.)   In its counterclaim, Defendant makes the conclusory allegation that Plaintiff's "conduct proximately injured [Defendant] in an amount to be proven at trial." (ECF No. 4 at CC, ¶ 106.)   However, Defendant pleads no facts regarding how it was, or how it could have been, injured by the filing of the Nursing Board complaint. The Nursing Board complaint was filed against Williams-Corbin only, not Defendant, and Defendant alleges that Williams-Corbin responded to the Nursing Board complaint. (*Id*. at ¶ 105.)   The complaint was resolved in Williams-Corbin's favor. (*Id*.)   Defendant does not allege that it took any action regarding the Nursing Board complaint, and Defendant has not alleged that the Nursing Board complaint had any impact on Defendant or its operations, let alone that it caused a "concrete and particularized and [ ] actual or imminent" injury that is "fairly traceable to the challenged action of" Defendant. *Neuse River Found.*, 155 N.C. App. at 114, 574 S.E.2d at 52.

43.   Accordingly, Plaintiff's motion to dismiss Defendant's counterclaim for abuse of process should be GRANTED.   Again, however, since the defect is a failure to allege actual injury, the claim should dismissed without prejudice.

*D. Defendant's Counterclaim for Declaratory Judgment*

44.   In the Motion, Plaintiff states that it seeks "an order dismissing the Counterclaim." (ECF No. 16, at p.1.)   To the extent Plaintiff intended to move for dismissal of Defendant's fourth counterclaim for declaratory judgment seeking a declaration regarding the enforceability of an employment agreement between Plaintiff and Williams-Corbin, (ECF No. 4 at CC, ¶¶ 107–14), neither party has

presented argument regarding this claim in their briefs or at the hearing on the Motion. Accordingly, the Court declines to consider the counterclaim for declaratory judgment as part of this Order and Opinion, and the Motion should be DENIED.

## III. CONCLUSION

THEREFORE, IT IS ORDERED that the Plaintiff's Motion to Dismiss Counterclaim is GRANTED, in part, and DENIED, in part, as follows:

1. Plaintiff's motion to dismiss Defendant's counterclaim for attempted monopolization is GRANTED, and that counterclaim is DISMISSED, without prejudice.

2. Plaintiff's motion to dismiss Defendant's counterclaim for unfair trade practices is GRANTED, and that counterclaim is DISMISSED, without prejudice.

3. Plaintiff's motion to dismiss Defendant's counterclaim for abuse of process is GRANTED, and that counterclaim is DISMISSED, without prejudice.

4. Plaintiff's motion to dismiss Defendant's counterclaim for declaratory judgment is DENIED.


This, the 16th day of January, 2019.

/s/ Gregory P. McGuire
Gregory P. McGuire
Special Superior Court Judge for
Complex Business Cases