IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA21-639

Filed 04 April 2023

Forsyth County, No. 19 CVS 3758

ALVIN MITCHELL, Petitioner,

v.

THE UNIVERSITY OF NORTH CAROLINA BOARD OF GOVERNORS, Respondent.

Appeal by Petitioner from Order entered 26 July 2021 by Judge Martin B. McGee in Forsyth County Superior Court. Heard in the Court of Appeals 11 May 2022.

*Allison Tomberlin for petitioner-appellant.*

*Attorney General Joshua H. Stein, by Assistant Attorney General Zach Padget, for respondent-appellee.*

HAMPSON, Judge.[1]

## **Factual and Procedural Background**

Alvin Mitchell (Petitioner) appeals from the trial court's Order affirming a decision of The University of North Carolina Board of Governors (BOG) which, in turn, upheld Petitioner's discharge from employment as a tenured professor at

---

[1] Judge Murphy contributed substantial authorship of those portions of the Opinion of the Court on which we are unanimous. This specifically includes the Factual and Procedural Background and our discussion of the alleged procedural errors asserted by Petitioner.

Winston-Salem State University (WSSU). The Record before us tends to reflect the following:

Petitioner was hired by WSSU in July 2006 as an Associate Professor of Justice Studies in the Department of Social Sciences and was granted tenure in December 2008. In July 2015, Dr. Cynthia Villagomez and Dr. Denise Nation became co-chairs of the Department of Social Sciences and, thus, Petitioner's direct supervisors. This appeal arises out of Petitioner's discharge from employment based on three alleged acts of misconduct by Petitioner taking place between the Fall of 2015 and the Fall of 2017 while he was under the supervision of Dr. Villagomez and Dr. Nation.

First, during Petitioner's Introduction to Corrections course in the Fall 2015 semester, a student submitted a paper that Petitioner did not feel met the necessary requirements. Petitioner provided the student an opportunity to resubmit the paper, which led to the student receiving a grade of "incomplete" in the class. Throughout 2016, the student and his academic success counselor attempted to reach out to Petitioner without success. Pursuant to WSSU policy, in December 2016, the student's grade of "incomplete" converted to an F. Dr. Nation and Petitioner's supervising Dean, Dr. Doria K. Stitts, both attempted to resolve the grade issue with him over email, but he did not respond. Dr. Nation and Dr. Villagomez approached Petitioner to discuss the issue as Petitioner was teaching a class, leading to a verbal altercation in which Dr. Villagomez called the police.

Second, sometime during the 2016-2017 academic year, two students in

Petitioner's Research Methods class conducted research to draft a paper. The students learned about a conference in New Orleans—the Race, Gender & Class Conference—where they could present their findings. They approached Dr. Nation to obtain funding to attend the conference, but she did not approve the funding, instead recommending a different conference by the American Society of Criminology (ASC). One of the students believed that Dr. Nation may have encouraged the students to look into the ASC conference because it was primarily Caucasian. When Petitioner learned of the conversation, he wrote a letter to Dr. Nation in response:

> Hi Denise, it was brought to my attention that you told a student that the conference I and two of my students are presenting at has no substance or standards, meaning that it is useless and unaccredited, and anyone can present. In addition, you told the student she should try to present at the ASC held in November because it is a better conference and has a lot of substance. You are entitled to your opinion. However, you should not be telling the student things like that, especially with no proof. The Race, Gender & Class conference is locally, regionally, and internationally known and ha[s] scholars from around the world presenting. In addition, the conference has been in existence for over 20 years. Thirdly, this conference does not take anyone. You have to be accepted through their process. It is amazing how you always try to debunk what I do. Yet you complain that I tell students negative things about you. It would have been better to tell the student that you did not want to help fund her instead of telling her falsehoods about the RGC conference and asking her to present on scholarship day. That is not appropriate behavior as a chair.
>
> After all these years, it is amazing that you still think that anything white is better. I looked up the ASC and nothing but a bunch of white men (some white women) are running it. Keep promoting and praising those white folks who are

associated with the ASC. As I told you before, you can graduate from and praise their schools, come up with a great theory, hangout with them, praise Latessa and other European professors (you need to ask them about their civil rights record), wear their European style weaves, walk with their bounce, hire them, present at their conferences, and even publish in their journals. In their eyes you will never be equal to them. They still look at you as a wanna be white, an international nigger, an international coon, and an international sambo (lol) because you display that kind of behavior. You will never get it. Wake up.

Dr. Nation believed the letter created a hostile workplace, and, while she ultimately decided to not file a formal complaint with the Equal Employment Opportunity Commission, she did report the incident to the Dean and Provost and sent them a copy of the letter.

Third, Petitioner's Summer 2017 semester Constitutional Law class was involuntarily reassigned by Dr. Nation to another professor because of concerns regarding the rigor of the course and his failure to provide a syllabus in a previous semester. Less than one week before the Fall 2017 semester, Petitioner informed Dr. Nation and Dr. Villagomez via email that he did not feel comfortable teaching Research Methods II—a course given to him in lieu of Constitutional Law—despite having already approved the course on his schedule and having taught it for at least six years. Dr. Nation did not allow him to change courses. On 22 August 2017, one day after the semester began, Dr. Nation informed Petitioner that he had failed to open an online course he was teaching. Petitioner responded by stating "I do not know my schedule anymore . . . ." However, Dr. Villagomez reiterated that his

schedule had not changed.

On 31 August 2017, WSSU Interim Provost Carolynn Berry provided Petitioner with notice of WSSU's intent to discharge him pursuant to Section 603 of *The Code of the Board of Governors of the University of North Carolina* (UNC Code) for neglect of duty and misconduct. According to the UNC Code, "neglect of duty[] includ[es] sustained failure to meet assigned classes or to perform other significant faculty professional obligations[,]" and "misconduct . . . includ[es] violations of professional ethics, mistreatment of students or other employees, research misconduct, financial fraud, criminal, or other illegal, inappropriate or unethical conduct." However, "[t]o justify serious disciplinary action, such misconduct should be either (i) sufficiently related to a faculty member's academic responsibilities as to disqualify the individual from effective performance of university duties, or (ii) sufficiently serious as to adversely reflect on the individual's honesty, trustworthiness or fitness to be a faculty member."

On 10 January 2018, a hearing was held before the Faculty Hearing Committee (FHC). Following the presentation of WSSU's case, the FHC determined that WSSU had not made a prima facie case and recommended the Chancellor overturn the sanctions. Despite this recommendation, in accordance with the UNC Code's procedure, the Chancellor issued a letter on 30 January 2018 disagreeing with the FHC's determination and sent the matter back to the FHC to conclude the hearing. After the Chancellor's determination, Petitioner informed the FHC he did

not wish to present any further evidence. The FHC once again found WSSU had not proven its case. However, after reviewing the transcript, the FHC's recommendation, and all of the evidence received by the FHC, the Chancellor issued his decision on 7 March 2018 and upheld the Provost's decision to discharge Petitioner. The Chancellor determined Petitioner violated the UNC Code via neglect of duty because he failed to provide his student with a final grade and failed to open the online course. The Chancellor also further determined Petitioner violated the UNC Code via misconduct when he sent the letter to Dr. Nation.

Following the Chancellor's determination, Petitioner appealed to the WSSU Board of Trustees (BOT). The Appeals Committee of the BOT concluded WSSU had produced sufficient evidence to uphold Petitioner's dismissal for neglect of duty and misconduct. Petitioner then sought review of the BOT's decision to the BOG, which upheld the BOT's decision on 23 May 2019. The BOG concluded as follows:

> Substantively, based upon a careful consideration of the record as a whole, statements submitted by the parties, and consideration of all controlling laws and policies, there is sufficient evidence in the record to support a determination that [Petitioner] failed to adequately resolve a grading issue, resulting in the student receiving a failing grade for the class and endangering the student's eligibility to receive financial aid, which failure constitutes neglect of duty under Section 603(1) of [the UNC Code]. In addition, there is sufficient evidence in the record to support the determination that [Petitioner] failed to timely open [a]n online class that he knew he was scheduled to teach, and that he continued to fail to open the class at least six days after being directed to do so by his department chairs and his [D]ean, which failure constitutes neglect of duty under

> Section 603(1) of [the UNC Code]. Finally, there is sufficient evidence in the record to support the determination that [Petitioner] wrote and delivered to his direct supervisor [a] personally and professionally insulting, racially inflammatory note in which he referred to her as a "nigger," a "coon," and a "sambo," which constitutes misconduct under Section 603(1) of [the UNC Code].

The BOG also found that "[Petitioner] erroneously characterize[d] his letter to Dr. Nation as [a] letter written by him in his capacity as a private citizen, on a matter of public concern."

Petitioner sought judicial review in Superior Court. After a whole record review, the trial court affirmed the decision of the BOG. The trial court concluded:

> the decision to terminate the Petitioner for (1) his neglect of duty for failing to open the online course, (2) his neglect of duty for failing to issue a final grade, and (3) misconduct for the derogatory and racially charged letter to [Dr. Nation] . . . is supported by substantial evidence in the record and is not arbitrary, capricious, or an abuse of discretion[.]
>
> . . . .
>
> the decision to discharge the Petitioner . . . was not in violation of any constitutional provisions, in excess of statutory authority or jurisdiction of the agency, made upon unlawful procedure or affected by other error of law. The Petitioner's discharge related to his letter of March 2017 was not in violation of his First Amendment rights and proper procedures were followed.

The trial court also ruled the process afforded Petitioner at the agency level was adequate. Petitioner timely appealed to this Court.

## Issues

On appeal to this Court, Petitioner raises two primary issues: (I) whether the BOG's decision upholding Petitioner's discharge from employment was affected by unlawful procedures during the proceedings before WSSU's FHR and Chancellor; and (II) whether Petitioner's discharge from employment was in violation of his First Amendment right of free speech where the discharge was based, in part, on the letter he sent to Dr. Nation.

## Analysis

"Appellate review of a superior court order concerning an agency decision requires an examination of the trial court's order for any errors of law." *Emp. Sec. Comm'n of N.C. v. Peace*, 128 N.C. App. 1, 6, 493 S.E.2d 466, 470 (1997), *aff'd in part, rev. dismissed in part*, 349 N.C. 315, 507 S.E.2d 272 (1998). Our standard of review is defined by statute:

> A party to a review proceeding in a superior court may appeal to the appellate division from the final judgment of the superior court as provided in G.S. 7A-27. The scope of review to be applied by the appellate court under this section is the same as it is for other civil cases. In cases reviewed under G.S. 150B-51(c), the court's findings of fact shall be upheld if supported by substantial evidence.

N.C. Gen. Stat. § 150B-52 (2021). Here, Petitioner "challenges the trial court's law-based inquiries, including whether the [BOT's] decision violated constitutional provisions, was made upon unlawful procedure, was in excess of statutory authority, or was affected by other error of law[.]" The trial court reviewed these asserted errors

under N.C. Gen. Stat. § 150B-51(c) and "the [trial] court's findings of fact shall be upheld if supported by substantial evidence." *Id.*

When conducting our review, the agency is entitled to a presumption of good faith.

> The agency's decision is presumed to be made in good faith and in accordance with governing law. Therefore, the burden is on the party asserting otherwise to overcome such presumptions by competent evidence to the contrary when making a claim that the decision was affected by error of law or procedure.

*Richardson v. N.C. Dep't of Pub. Instruction Licensure Section*, 199 N.C. App. 219, 223-24, 681 S.E.2d 479, 483, *disc. rev. denied*, 363 N.C. 745, 688 S.E.2d 694 (2009) (citation omitted). "It is well established that an agency's construction of its own regulations is entitled to substantial deference." *Morrell v. Flaherty*, 338 N.C. 230, 237, 449 S.E.2d 175, 179-80 (1994) (citation and quotation marks omitted). We must also generally defer to the agency's interpretation of its regulations "unless it is plainly erroneous." *Id.* at 238, 449 S.E.2d at 180.

I.  WSSU Hearing Procedures

"To assert a due process claim, [Petitioner] must show that [he was] deprived of a protected property interest in employment. If tenured, an employee has a protected property right because tenure constitutes a promise of continued employment." *Pressman v. Univ. of N.C. at Charlotte*, 78 N.C. App. 296, 302, 337 S.E.2d 644, 648 (1985) (citations omitted). Here, Petitioner was a tenured professor

who held a protected property interest in his employment. "Section 603 specifies the due process protections to which a tenured faculty member is entitled and contains a detailed schedule of steps involving notice and hearings which the university must take prior to discharging a tenured faculty member." *Bernold v. Bd. of Governors of Univ. of N.C.*, 200 N.C. App. 295, 299, 683 S.E.2d 428, 431 (2009). Even if the UNC Code satisfies the requirements of due process, WSSU must then comply with its own procedures. *McAdoo v. Univ. of N.C. at Chapel Hill*, 225 N.C. App. 50, 68-69, 736 S.E.2d 811, 824 (2013) ("A state actor violates due process when it fails to follow its own rules and procedures." (citations omitted)). Petitioner puts forward three instances in which he believes his due process rights were violated by WSSU's failure to comply with its own procedures: the Chancellor ignoring the prima facie determinations made by the FHC; Petitioners own waiver of a full hearing; and the trial court's reliance on what were purportedly the Chancellor's findings of fact instead of the FHC's.

*A. Chancellor Declining to Accept the FHC's Recommendation*

First, Petitioner asserts that the Chancellor could not move forward with his dismissal when the FHC determined twice that WSSU had failed to make out a prima facie case. We disagree. While the Chancellor is required to consider the recommendations of the FHC, the decision to discharge ultimately remains with the Chancellor under the UNC Code. The FHC's decision at the end of the hearing is transmitted to the Chancellor as a written recommendation. The Chancellor is

expressly allowed to "decline[] to accept a [FHC] recommendation that is favorable to the faculty member[.]" According to Petitioner, this renders the due process protections outlined in the Faculty Handbook meaningless.[2] However, the Faculty Handbook contemplates that a record will be made at the FHC hearing which can be used on the multiple levels of appeal available to WSSU and faculty members: "[T]he purpose of the hearing is to create a record of testimony and documentary evidence for review by the parties, the [BOT] and/or [BOG], should the Faculty Member seek further review of the discharge or imposition of other serious sanctions." For a better record, "[i]f the Chancellor disagrees with the [FHC's] determination [of whether a prima facie case has been presented], he/she will send it back for a full hearing."

Indeed, in this case, the Chancellor expressly sent the matter back to the FHC for the FHC to conclude the hearing and provide Petitioner an opportunity to present evidence. Petitioner declined. Furthermore, WSSU submits a different interpretation of the UNC Code. WSSU, as a government agency, interprets its procedure to mean that the Chancellor has the final say if the Chancellor and the FHC disagree. "It is well established that an agency's construction of its own regulations is entitled to substantial deference." *Morrell*, 338 N.C. at 237, 449 S.E.2d at 179-80 (citation and quotation marks omitted). We must also generally defer to the agency's interpretation of its regulations "unless it is plainly erroneous." *Id.* at

---

[2] Mitchell does not argue that the Chancellor did not provide a meaningful review of the FHC's recommendations.

238, 449 S.E.2d at 180. The agency's interpretation of the ultimate decision maker is not plainly erroneous. The text of the UNC Code aligns with the interpretation followed by WSSU: "The [C]hancellor shall issue a *final* written opinion within 30 [d]ays after receiving the hearing documents including the transcript of the hearing. The [C]hancellor's decision shall be based on the recommendations and evidence received from the FHC including the Transcript of the hearing." (emphasis added.)

We find it analytically relevant that the FHC is tasked with providing "recommendations," while the Chancellor issues a "final written opinion" based on those recommendations. The Chancellor and the FHC clearly have separate roles to play in the discipline process; therefore, it was not plainly erroneous for WSSU to interpret the role of the Chancellor as the final decision maker in instances of disagreement with the FHC.

*B. Petitioner's Decision Not to Present Further Evidence*

Second, Petitioner argues that he could not have knowingly, intelligently, and voluntarily waived his right to a full hearing because he erroneously believed the Chancellor was bound by the FHC's recommendations. Petitioner was represented by counsel at the FHC's hearing and aware of the purposes of the hearing as described in the notice provided to him. Petitioner made his own decision not to present further evidence after the prima facie determination was rejected by the Chancellor. He was also aware of his ability to present evidence at that point in the hearing; the WSSU Faculty Handbook states that "[t]he Faculty Member shall have the right to counsel,

to present the testimony of witnesses and other evidence, to confront and cross-examine adverse witnesses and to examine all documents and other adverse demonstrative evidence, and to make argument." Petitioner's decision not to present argument after the prima facie determination was rejected by the Chancellor does not make the procedure afforded to him defective or violate his due process rights.

### C. Chancellor Acting as a Fact Finder

Third, Petitioner argues that only the FHC was authorized to function as a fact finder and not the Chancellor. Even presuming, without deciding, Petitioner's argument is correct, Petitioner has presented no evidence that the Chancellor ignored the findings of fact reached by the FHC.

> The agency's decision is presumed to be made in good faith and in accordance with governing law. Therefore, the burden is on the party asserting otherwise to overcome such presumptions by competent evidence to the contrary when making a claim that the decision was affected by error of law or procedure.

*Richardson*, 199 N.C. App. at 223-24, 681 S.E.2d at 483 (citation omitted). Without anything in the Record to support Petitioner's assertion, he has not overcome the presumption that the Chancellor acted in good faith and in accordance with governing law when reviewing the recommendations of the FHC, as the Chancellor could have reached a different conclusion than the FHC using the same set of facts. Thus, regardless of whether it would constitute a violation of due process for the Chancellor to have acted in a fact-finding capacity, Petitioner presented no evidence to support

that the Chancellor so acted; accordingly, this argument fails.

For all the reasons stated above, Petitioner's due process rights were not violated when the Chancellor rejected the prima facie determination made by the FHC; when he chose not to present argument after the prima facie determination; or when the Chancellor reached a different conclusion than the FHC after reviewing the record and recommendation. Accordingly, the procedure used to terminate Petitioner's employment was not unlawful, defective, or in violation of his due process rights.

## II. Discharge based on Petitioner's Letter to Dr. Nation

Petitioner further argues the trial court's decision upholding the BOG's final decision upholding Petitioner's discharge—based in part on Petitioner's letter to Dr. Nation—was in error because, Petitioner contends, his letter "touched upon a matter of public concern." As such, he argues that, as a public employee, his discharge implicated his First Amendment right to free speech and violated his protected interest in freedom of expression. We disagree.

"Public employment may not be conditioned on criteria that infringes the employees' protected interest in freedom of expression." *Pressman*, 78 N.C. App. at 300, 337 S.E.2d at 647 (citation omitted). "An employee may not be discharged for expression of ideas on a matter of public concern." *Id.* (citation omitted). "The expression need not be public but may be made in a private conversation." *Id.* (citation omitted).

"To make out a claim under the First Amendment, the [public] employee must show that his speech is concerning a matter of public concern." *Id.* (citing *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). "A matter is of public concern if when fairly considered it relates 'to any matter of political, social, or other concern to the community.' " *Id.* at 300-01, 337 S.E.2d at 647 (quoting *Connick*, 461 U.S. at 146, 103 S.Ct. at 1690, 75 L.Ed.2d at 719). "The context, form, and content of the employee's speech as revealed by the whole record are used to determine the nature of the speech." *Id.* at 301, 337 S.E.2d at 647. "Whether speech is a matter of public concern is a question of law for the courts to decide." *Id.* at 301, 337 S.E.2d at 647-48.

"If the speech is upon a matter of public concern, there must be a 'balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' " *Id.* (quoting *Connick*, 461 U.S. at 142, 103 S.Ct. at 1687, 75 L.Ed.2d at 717 (citation and quotation marks omitted)). "The balancing of interests is a question of law for the courts." *Id.* (citation omitted).

Here, the BOG determined Petitioner failed to present any evidence that his letter to Dr. Nation addressed a matter of public concern. The BOG further noted Petitioner "erroneously characterized" his letter as addressing a matter of public concern. The trial court affirmed this ruling.

Indeed, on appeal, Petitioner again cites no record support for his contention. Instead, Petitioner contends, without citation, his letter was "an impassioned plea" and a "strongly worded condemnation of racism within academia and Nation's perceived participation in that racist culture." There is no evidence in this Record, however, that Dr. Nation's decision to deny funding to Petitioner's students for Petitioner's chosen conference was racially motivated or a product of racial bias in academia. There is, further, also no evidence that Petitioner intended his letter to be an effort to combat racism in academia or to advocate on the part of his students for funding to attend his preferred conference on that basis.

To the contrary, the context, form, and content of Petitioner's speech—as revealed by the whole Record—reflects Petitioner's speech was nothing more than an expression of his personal grievance towards Dr. Nation and his displeasure with her administrative decision not to provide funding for Petitioner's preferred conference. That Petitioner did so by invoking his own racist epithets does not convert his letter into one addressing a matter of public concern. In fact, in *Pressman*, this Court addressed a professor's statements during a meeting concerning a Dean's lack of administrative competence, including a lack of opportunity for personal growth because of a heavy workload, lack of guidance for grading, and the failure to develop a master's program and a recruiting program. *Pressman*, 78 N.C. App. at 301, 337 S.E.2d at 648. This Court found the "criticism not based on public-spirited concern but more narrowly focused on [the professor's] own personal work and his personal

displeasure with internal policies." *Id*. at 301-02, 337 S.E.2d at 648. Thus, the Court concluded the professor failed to show his speech was addressing a matter of public concern and, thus, did not implicate the professor's First Amendment protections as a public employee. Here, even ignoring Petitioner's racial invectives directed towards Dr. Nation, the letter, taken in context, is nothing more than criticism focused on Petitioner's own work, broader disagreements with Dr. Nation and her criticism of him, and his displeasure with her decision not to provide funding.

Thus, Petitioner's letter to Dr. Nation, in this case, did not implicate a matter of public concern. Therefore, the BOG did not commit any error of law by upholding Petitioner's discharge from employment based, in part, on his letter to Dr. Nation. Consequently, the trial court did not err in affirming the BOG.

## Conclusion

Accordingly, for the foregoing reasons, we affirm the trial court's 26 July 2021 Order.

AFFIRMED.

Judge ZACHARY concurs.

Judge MURPHY concurs in part and dissents in part in separate opinion.

MURPHY, Judge, concurring in part and dissenting in part.

While I agree with the Majority's analysis as to whether Petitioner was afforded adequate process during termination proceedings, I dissent in part from the Majority on the basis that Petitioner's remarks implicated a matter of public concern, therefore requiring the trial court to conduct a First Amendment balancing test.

"It is clearly established that a State may not discharge an employee on a basis that infringes the employee's constitutionally protected interest in freedom of speech." *Rankin v. McPherson*, 483 U.S. 378, 383 (1987). This is true "despite the fact that the statements are directed at their [] superiors." *Pickering v. Board of Education*, 391 U.S. 563, 574 (1968). "The threshold question . . . is whether [Petitioner's] speech may be fairly characterized as constituting speech on a matter of public concern." *Id.* "The determination of whether speech is protected under the First Amendment is a question of law." *Holland v. Harrison*, 254 N.C. App. 636, 643 (2017).

Controversial speech by a public employee is not a novel issue. In *Pressman v. University of North Carolina at Charlotte*, a nontenured professor was denied reappointment after he "attended a faculty meeting where the faculty discussed [the university dean's] lack of administrative competence." *Pressman v. University of North Carolina at Charlotte*, 78 N.C. App. 296, 298 (1985). The professor expressed his concern over a variety of workplace topics at the meeting. *Id.* Establishing North Carolina's two-pronged test regarding free speech by government employees, we said

the following:

> To make out a claim under the First Amendment, the employee must show that his speech is concerning a matter of public concern. A matter is of public concern if when fairly considered it relates "to any matter of political, social, or other concern to the community." The context, form, and content of the employee's speech as revealed by the whole record are used to determine the nature of the speech. Whether speech is a matter of public concern is a question of law for the courts. If the speech is upon a matter of public concern, there must be a "balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." The balancing of interests is a question of law for the courts.

*Id.* at 300-01 (quoting *Connick v. Myers*, 461 U.S. 138 (1983)). We held that the professor's "speech was not upon a matter of public concern." *Id.* at 301. Instead, "[h]is speech can be more accurately described as an employee grievance concerning internal policy." *Id.* His "criticism [was] not based on public-spirited concern but more narrowly focused on his own personal work and his personal displeasure with internal policies." *Id.* at 301-02.

Here, Petitioner's letter to Dr. Nation reads, in whole, as follows:

> Hi Denise, it was brought to my attention that you told a student that the conference I and two of my students are presenting at has no substance or standards, meaning that it is useless and unaccredited, and anyone can present. In addition, you told the student she should try to present at the ASC held in November because it is a better conference and has a lot of substance. You are entitled to your opinion. However, you should not be telling the student things like that, especially with no proof. The Race, Gender & Class

2

conference is locally, regionally, and internationally known and ha[s] scholars from around the world presenting. In addition, the conference has been in existence for over 20 years. Thirdly, this conference does not take anyone. You have to be accepted through their process. It is amazing how you always try to debunk what I do. Yet you complain that I tell students negative things about you. It would have been better to tell the student that you did not want to help fund her instead of telling her falsehoods about the RGC conference and asking her to present on scholarship day. That is not appropriate behavior as a chair.

After all these years, it is amazing that you still think that anything white is better. I looked up the ASC and nothing but a bunch of white men (some white women) are running it. Keep promoting and praising these white folks who are associated with the ASC. As I told you before, you can graduate from and praise their schools, come up with a great theory, hangout with them, praise Latessa and other European professors (you need to ask them about their civil rights record), wear their European style weaves, walk with their bounce, hire them, present at their conferences, and even publish in their journals. In their eyes you will never be equal to them. They still look at you as a wanna be white, an international nigger, an international coon, and an [i]nternational sambo (lol) because you display that kind of behavior. You will never get it. Wake up.

Under *Pressman*, the question this letter raises is twofold and subject to resolution as a matter of law: (1) whether the speech at issue, holistically and in context, addresses a matter of public concern and (2) whether the interests of the employee in expressing the concern outweigh the employer's interest in the efficient administration of its services. As the extent of the discussion of this constitutional issue at trial was a singular statement that Petitioner's termination "was not in violation of any constitutional provisions," I understand the trial court to have ruled,

3

without discussion, that the letter did not address a matter of public concern.

At the threshold, I make two notes. First, the broader subject of academia's relationship with race has long been acknowledged as a subject of public concern and remains so, now more than ever. Universities in this state and across the country market themselves to, and communicate with, the public based on demographic diversity with respect to—among other things—race. *See, e.g.*, Duke University Office of the Provost, *Duke's Commitment to Diversity and Inclusion*, https://provost.duke.edu/initiatives/commitment-to-diversity-and-inclusion (last accessed 5 January 2023); Wake Forest University, *Diversity & Inclusion*, https://admissions.wfu.edu/experience-wake-forest/diversity/ (last accessed 5 January 2023); Harvard University, *Diversity and Inclusion*, https://www.harvard.edu/about/diversity-and-inclusion/ (last accessed 5 January 2023); Stanford Graduate School of Business, *Diversity, Equity & Inclusion*, https://www.gsb.stanford.edu/experience/diversity-equity-inclusion (last accessed 5 January 2023); *see also Campus Ethnic Diversity: National Universities*, U.S. News & World Report, https://www.usnews.com/best-colleges/rankings/national-universities/campus-ethnic-diversity (last accessed 5 January 2023). Copious amounts of ink have been spilled over what the significance of race in academia should be, what constitutes racism, and how to solve the myriad of problems it poses. *See, e.g.*, Kevin Laland, *Racism in academia, and why the 'little things' matter*, Nature

4

(Aug. 25, 2020), https://www.nature.com/articles/d41586-020-02471-6; John McWhorter, *Words Have Lost Their Common Meaning*, The Atlantic (Mar. 31, 2021), https://www.theatlantic.com/ideas/archive/2021/03/nation-divided-language/618461/; Yuvraj Joshi, *Racial Transition*, 98 Wash. U. L. Rev. 1181, 1203-1208 (2021).  The U.S. Department of Education has reported on racial diversity in higher education.  United States Department of Education, *Advancing Diversity and Inclusion in Higher Education: Key Data Highlights Focusing on Race and Ethnicity and Promising Practices* (Nov. 2016), https://www2.ed.gov/rschstat/research/pubs/advancing-diversity-inclusion.pdf (last accessed 5 January 2023).  The way race is taught in schools has become one of the defining political issues of this decade.  *See* Lauren Camera, *Congressional Democrats Target Bans on Teaching About Racism in Schools*, U.S. News & World Report (Feb. 2, 2022, 3:06 p.m.), https://www.usnews.com/news/education-news/articles/2022-02-02/congressional-democrats-take-aim-at-efforts-to-ban-critical-race-theory (last accessed 5 January 2023); Stephen Kearse, *GOP Lawmakers Intensify Effort to Ban Critical Race Theory in Schools*, Pew (June 14, 2021), https://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2021/06/14/gop-lawmakers-intensify-effort-to-ban-critical-race-theory-in-schools.  Few topics could be more legitimately said to constitute issues of public concern.

Second, the bulk of authoritative caselaw addressing adverse employment

action in response to employee speech has attempted to cleanly differentiate speech concerning sociopolitical issues from speech concerning strictly personal or administrative issues. In *Connick v. Myers*, the U.S. Supreme Court laid out the then-recent history of developments in First Amendment jurisprudence concerning adverse employment action:

> For most of this century, the unchallenged dogma was that a public employee had no right to object to conditions placed upon the terms of employment—including those which restricted the exercise of constitutional rights. The classic formulation of this position was Justice Holmes, who, when sitting on the Supreme Judicial Court of Massachusetts, observed: "A policeman may have a constitutional right to talk politics, but he has no constitutional right to be a policeman." For many years, Holmes' epigram expressed this Court's law.

> The Court cast new light on the matter in a series of cases arising from the widespread efforts in the 1950s and early 1960s to require public employees, particularly teachers, to swear oaths of loyalty to the state and reveal the groups with which they associated. In *Wieman v. Updegraff*, 344 U.S. 183[] . . . (1952), the Court held that a State could not require its employees to establish their loyalty by extracting an oath denying past affiliation with Communists. In *Cafeteria Workers v. McElroy*, 367 U.S. 886[] . . . (1961), the Court recognized that the government could not deny employment because of previous membership in a particular party. By the time *Sherbert v. Verner*, 374 U.S. 398[] . . . (1963), was decided, it was already "too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." It was therefore no surprise when in *Keyishian v. Board of Regents*, 385 U.S. 589[] . . . (1967), the Court invalidated New York statutes barring employment on the basis of

membership in "subversive" organizations, observing that the theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, had been uniformly rejected.

In all of these cases, the precedents in which *Pickering* [*v. Board of Education*, 391 U.S. 563 (1968),] is rooted, the invalidated statutes and actions sought to suppress the rights of public employees to participate in public affairs. The issue was whether government employees could be prevented or "chilled" by the fear of discharge from joining political parties and other associations that certain public officials might find "subversive." The explanation for the Constitution's special concern with threats to the right of citizens to participate in political affairs is no mystery. The First Amendment was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people. Speech concerning public affairs is more than self-expression; it is the essence of self-government. Accordingly, the Court has frequently reaffirmed that speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection.

*Pickering* . . . followed from this understanding of the First Amendment. In *Pickering,* the Court held impermissible under the First Amendment the dismissal of a high school teacher for openly criticizing the Board of Education on its allocation of school funds between athletics and education and its methods of informing taxpayers about the need for additional revenue. Pickering's subject was a matter of legitimate public concern upon which free and open debate is vital to informed decision-making by the electorate.

Our cases following *Pickering* also involved safeguarding speech on matters of public concern. The controversy in *Perry v. Sindermann,* 408 U.S. 593[] . . . (1972), arose from the failure to rehire a teacher in the state college system who had testified before committees of the Texas legislature and had become involved in public

disagreement over whether the college should be elevated to four-year status—a change opposed by the Regents. In *Mt. Healthy City Board of Ed. v. Doyle,* 429 U.S. 274[] . . . (1977), a public school teacher was not rehired because, allegedly, he had relayed to a radio station the substance of a memorandum relating to teacher dress and appearance that the school principal had circulated to various teachers. The memorandum was apparently prompted by the view of some in the administration that there was a relationship between teacher appearance and public support for bond issues, and indeed, the radio station promptly announced the adoption of the dress code as a news item. Most recently, in *Givhan v. Western Line Consolidated School District,* 439 U.S. 410[] . . . (1979), we held that First Amendment protection applies when a public employee arranges to communicate privately with his employer rather than to express his views publicly. Although the subject-matter of Mrs. Givhan's statements were not the issue before the Court, it is clear that her statements concerning the school district's allegedly racially discriminatory policies involved a matter of public concern.

*Connick*, 461 U.S. at 143-46 (marks and extratextual citations omitted). *Pressman*, which cited *Connick* in its articulation of the two-pronged test cited above, reached a different result than the most recent cases *Connick* cited, holding that a state employee's speech was simply "an employee grievance concerning internal policy" rather than one "based on public-spirited concern" when it concerned a college administration's "lack of opportunity for personal development . . . , lack of guidance for grading, failure to develop a masters program, failure to recruit quality students and faculty, and inadequate or inappropriate educational direction . . . ." *Pressman*, 78 N.C. App. at 298, 301-302.

While the Majority treats the fact pattern in *Pressman* and the ensuing holding as directly controlling in this case, Petitioner's letter fits only with great difficulty into the framework set out in *Connick* and *Pressman*; it reads, simultaneously and inseparably, as a defense of the academic legitimacy of a conference, an expression of dissatisfaction on the state of racial diversity in academia, and a statement of frustration with Dr. Nation, both personally and with any potential unconscious biases. Admittedly, examining the speech at issue holistically and in context—as we must, *see Pressman*, 78 N.C. App. at 300-01—the letter's status is not immediately clear on its face. Its first paragraph, while critical of Dr. Nation's conduct toward a student, reads not simply as a rebuke, but an attempt to defend the broader academic legitimacy of the RGC conference by appealing to its level of recognition, longevity, and internal vetting process. And the second paragraph—the only part of the letter discussed by the trial court—was not an isolated set of remarks; rather, it was an elaboration on the first paragraph and an expression of Petitioner's belief that racial bias informed the perception that the RGC was less academically legitimate than other conferences. Petitioner's personal criticisms of Dr. Nation, while undeniably present, were predicated on concern for her impact on the perceived social and academic value of the conference and informed by the social and academic influence she exerted by virtue of her position.

Given the blended nature of the letter, we have been tasked with answering

whether the personally offensive character of the letter precludes our holding that it addresses a matter of public concern under *Pressman* and *Connick*. And the answer, as informed by the analysis of the U.S. Supreme Court in *Givhan v. W. Consol. Sch. Dist.*, 439 U.S. at 411-413, is no. There, as discussed in the above-quoted portion of *Connick*, the Court held that an employee's views on a matter of public concern are protected even when expressed privately. *Givhan*, 439 U.S. at 414 ("This Court's decisions . . . do not support the conclusion that a public employee forfeits his protection against governmental abridgment of freedom of speech if he decides to express his views privately rather than publicly."). The remarks by the plaintiff in that case were more than just private; they were, according to the defendant school district, "'insulting,' 'hostile,' 'loud,' and 'arrogant[,]'" yet they were held to address a matter of public concern nonetheless. *Id.* at 412. So too here.[3]

To be clear, in concluding that Petitioner's letter—especially its second paragraph—addressed a matter of public concern rather than merely being a statement of racial abuse, I am cognizant of its *precise* framing and context. Petitioner's use of racially-charged rhetoric in the letter was not a statement that Mitchell regarded Dr. Nation as lesser because of her race; rather, it was a statement

---

[3] I further note that the remarks at issue in *Givhan*, much like the remarks here, were most immediately trained on the policies of the school at which the petitioner in that case was employed while also implicating broader social issues. *Id.* at 412-13 (marks omitted) (noting that the "petitioner had made demands on [] two occasions" but that "all the complaints in question involved employment policies and practices at the school which petitioner conceived to be racially discriminatory in purpose or effect").

of Petitioner's perception that *other* academics saw Dr. Nation as lesser because of her race—a perception presumably informed by his own experience as a Black academic and scholar. Indeed, the Record indicates that the letter may have been prompted in the first instance by a *student's* concerns that Dr. Nation had recommended the ASC over the RGC on a racially preferential basis. Our courts are duly attuned to the fact that, in the ordinary case, use of racial slurs and epithets, especially when employed to insult a member of a different racial group, are inflammatory, deeply wounding, and sufficient to constitute constitutionally unprotected "fighting words." *See In re Spivey*, 345 N.C. 404, 414-15 (1997).[4]

---

[4] Our Supreme Court's full reasoning in *Spivey* was as follows:

> By another assignment of error, [the] respondent Spivey contends that his removal from office for his behavior, including the use of the word "nigger" and other tasteless language, violates the First Amendment to the Constitution of the United States and Article I, Section 14 of the Constitution of North Carolina. Spivey argues that he has been wrongly removed from office because of the content of his speech. He claims that this violated his constitutionally protected right to express his viewpoint. We disagree.
>
> Taken in context, the use of the word "nigger" by Spivey squarely falls within the category of unprotected speech defined by the Supreme Court in *Chaplinsky v. New Hampshire*, 315 U.S. 568[] . . . (1942). In *Chaplinsky*, the United States Supreme Court wrote
>
>> [I]t is well understood that the right of free speech is not absolute at all times and under all circumstances. There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or "fighting" words—those which by their very utterance

11

> inflict injury or tend to incite an immediate breach of
> the peace.

*Id.* at 571-72[] . . . . At the hearing on this matter, there was testimony concerning the hurt and anger caused African-Americans when they are subjected to racial slurs by white people. We question, however, whether such testimony was necessary to the findings of the superior court in this case. Rule 201(b) of the North Carolina Rules of Evidence provides that a trial court may take judicial notice of a fact if it is not subject to reasonable dispute in that it is generally known within the territorial jurisdiction of the trial court. N.C.G.S. § 8C-1, Rule 201(b) (1992). No fact is more generally known than that a white man who calls a black man a "nigger" within his hearing will hurt and anger the black man and often provoke him to confront the white man and retaliate. The trial court was free to judicially note this fact. Additionally, evidence concerning the circumstances surrounding Spivey's verbal outbursts in the bar tends to show that his use of this racial epithet in the present case was intended by him to hurt and anger Mr. Jacobs and to provoke a confrontation with him. "'Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution.'" *Chaplinsky*, 315 U.S. at 572[] . . . (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 309-10[] . . . (1940)).

[The] [r]espondent Spivey cites *Bond v. Floyd*, 385 U.S. 116[] . . . (1996), for the proposition that governmental restriction on the ability of elected officials to express their views, however objectionable, stifles public debate and violates the First Amendment. We conclude that nothing in that opinion protects the use of racial invective by a public official against a member of the public in a bar. Spivey's use of the word "nigger" and his abusive conduct on the night in question did not in any way involve an expression of his viewpoint on any local or national policy. In fact, Spivey himself has repeatedly asserted since the incident in question that the use of the racial epithet "nigger" does not in any way reflect his views about race.

Mr. Spivey's abusive verbal attack on Mr. Jacobs which gave rise to the inquiry removing him from office is not protected speech under the First Amendment. Instead, when taken in context, his repeated references to Mr. Jacobs as a "nigger" presents a classic case of the use of "fighting words" tending to incite an immediate breach of the peace which are not protected by either the Constitution of the United States or the Constitution of North Carolina. We overrule this assignment of error.

*In re Spivey*, 345 N.C. 404, 414-15 (1997).

However, this is not the ordinary case; and, while I express no opinion on the underlying veracity of Petitioner's remarks, their *function* was more than simple derogation.

I would reverse the trial court's determination that Petitioner's speech did not address a matter of public concern. However, as the trial court's tacit determination that Petitioner's speech did not implicate the First Amendment discontinued its analysis before it conducted a balancing test under the second prong of *Pressman*, I would also remand the case for further proceedings, as that issue has not yet been "raised and passed upon in the trial court." *State v. Morrow*, 200 N.C. App. 123, 127 (2009) (emphasis added) ("Appellate courts will not ordinarily pass upon a constitutional question unless it affirmatively appears that such question was raised *and passed upon* in the trial court."); *see also Pressman*, 78 N.C. App. at 300-01 (marks and citations omitted) (emphasis added) ("If the speech is upon a matter of public concern, there must be a balance between the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees. The balancing of interests is a question of law *for the courts*."). Should the trial court have then determined that Petitioner's interests in making the statements in the letter outweighed any countervailing interests of WSSU in terminating him, the trial court may have further determined whether any of the

13

remaining bases offered by WSSU, independently or in combination, supported Petitioner's termination.

I respectfully dissent in part.