An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-692

Filed 4 March 2026

Haywood County, No. 24JA000059-430

IN THE MATTER OF: L.M.C.

Appeal by Respondent-Father from orders entered 21 January 2025 and 19 March 2025 by Judge Justin B. Greene in Haywood County District Court. Heard in the Court of Appeals 11 February 2026.

*Attorney Richard Croutharmel, for the respondent-appellant father.*

*Parent Defender Annick Lenoir-Peek, by Senior Assistant Parent Defender J. Lee Gilliam, for the respondent-appellant father.*

*Attorney Rachel J. Hawes, for the petitioner-appellee Haywood County Health and Human Services Agency.*

*Attorney Brittany T. McKinney, for the petitioner-appellee Guardian ad Litem.*

STADING, Judge.

Respondent-Father ("Father") appeals from the trial court's orders that adjudicated L.M.C. ("Lainey")[1] and J.F.P. ("Jessica")[2] as abused and neglected juveniles; placed the minor children in the custody of the Haywood County Health

---

[1] We use pseudonyms to protect the identities of the minor children. N.C. R. App. P. 42(b).
[2] J.F.P. is not a party to this appeal.

and Human Services Agency (the "Agency"); ceased reunification efforts with Father; and suspended Father's contact with Lainey. On appeal, Father asserts the trial court committed error by giving the Agency authority to consent to the prescription of psychotropic medications for Lainey because it failed to render sufficient findings in accordance with N.C. Gen. Stat. § 7B-505.1(c)(1) (2023). In response, the Agency and the Guardian Ad Litem (the "GAL") jointly moved this Court to dismiss Father's appeal on the basis that it is moot. *See* N.C. R. App. P. 37. After careful consideration, we deny the joint motion to dismiss and affirm the trial court's orders.

## I. Background

The record tends to show that from 2023 through 2024, the Agency received several reports concerning Father, Respondent-Mother,[3] and Lainey. On 2 August 2023, the Agency learned, among other things, that child protective services ("CPS") had been working with the respondent-parents "due to the home being so full of trash it could not be entered." The next day, several social workers from the Agency and Chief Matt Boger of the Maggie Valley Police Department visited the home. Father reported the home had been without hot water for a long time, resulting in the minor children bathing at their grandmother's home. The Agency closed its case in October 2023, as neither child made troubling disclosures and the home was in adequate

---

[3] Respondent-Mother is not a party to this appeal.

condition.[4]

A little less than a year later, on 20 June 2024, the Agency obtained non-secure custody of Lainey at 11:26 p.m. after receiving several reports from CPS within less than twenty-four hours. The Agency received the first report at 1:29 a.m., which stated Lainey "was picked up at her grandmother's home . . . by . . . Jacob Rich . . . and driven to West Virginia." Jacob drove Lainey to the Blue Field Police Department (the "BFPD"), where she disclosed that Father had been sexually assaulting her. Father arrived at the police station at 9:15 a.m. At 10:40 a.m., the Agency received the second report, alleging Jacob had abducted Lainey. However, the first and second reports were "screened out" for various reasons.

The Agency received a third report from CPS at 3:05 p.m., which stated that Lainey "had been abducted by a . . . man and taken to another state[.]" The subsequent report also alleged that Father refused "to cooperate with follow-up services" and refused to allow Lainey "to undergo a Forensic Interview and Child Medical Examination." A few hours later, at 5:15 p.m., CPS provided the fourth report, noting that Father had been messaging other men on an application known

---

[4] In addition to the matters discussed in the body of this opinion, the Agency's petition maintained that on 26 August 2019, Father notified the Haywood County Sheriff's Office that Lainey "had disclosed to her teacher that her 'Papaw Bobby' had held her down and touched her private area." Several days later, Lainey received a Child Medical Exam and "disclosed that her Paternal Step-Grandfather . . . had digitally penetrated her five or six times." The paternal grandfather was later charged and convicted of indecent liberties with a child. Several years later, after the adjudication hearing in 2024, the trial court found that Father also had been sexually abusing Lainey during this time.

as "Just Talk." The report alleged that Father had messaged a man named Carlos to set up sexual encounters between Carlos and Lainey. At this time, Chief Boger similarly reported to the Agency his concern that Father "was trafficking [Lainey] for sex."

That same day, 20 June 2024, the Agency filed a petition, alleging that Lainey and Jessica were abused, neglected, and dependent juveniles. The Agency later filed an amended petition on 5 September 2024. After considering the parties' arguments, the trial court entered an order on 21 January 2025, adjudicating the minor children as abused and neglected juveniles:

> 75. [Lainey] is an Abused juvenile, as defined by N.C.G.S. 7B-101(1), for all the reasons stated above, and due to the Respondent Parents' committing, permitting, or encouraging the commission of a sex or pornography offense by, with, or upon the juvenile in violation of the criminal law, and willful failure to see to her medical needs, putting her at substantial risk of serious physical injury by other than accidental means.
>
> 76. [Jessica] is an Abused juvenile, as defined by N.C.G.S. 7B-101(1), for all the reasons stated above, and due to her Legal Custodians' willful failure to see to her medical needs, putting her at substantial risk of serious physical injury by other than accidental means.
>
> 77. [Lainey] and [Jessica] are Neglected juveniles, as defined by N.C.G.S. 7B-101(1), for all the reasons stated above, and as their Respondent Parents and Legal Custodians do not provide proper care, supervision, or discipline, has not provided or arranged for the provision of necessary medical care, and has created or allowed to be created a living environment that is injurious to the juveniles' welfare[.]

The trial court found Lainey had engaged in a relationship "with a thirty-six . . . year old male name Carlos who she met on a social media website," and that Father knew about the relationship with Carlos and "allowed [Lainey] to continue to talk to him." The trial court also found that Father and Carlos shared "sexually explicit" and "extremely graphic" messages concerning Lainey, including messages discussing sexual encounters. Moreover, the trial court found that upon searching Father's home, the Maggie Valley Police Department discovered seven cell phones. Those cell phones contained "sexual content between [Lainey] and Carlos" and "were very disturbing in nature."

The trial court also found that: Jacob, the man who drove Lainey to West Virginia and the BFPD, was thirty-four years old and was Lainey's boyfriend; Respondent-Mother knew of the relationship between Lainey and Jacob; Respondent-Mother told Jacob that Lainey "was twenty . . . years old"; Jacob brought Lainey to West Virginia on the day in question to live with him; Respondent-Mother knew of Jacob's plan to move Lainey to West Virginia; Lainey told Jacob that Father had been sexually assaulting her; Lainey went to West Virginia with Jacob "to escape that sexual abuse" by Father; Jacob brought Lainey to the BFPD thereafter to make a report; the BFPD retrieved Lainey from Jacob's home once they discovered "that she was thirteen . . . years old"; and upon Lainey's return to North Carolina, the Agency "removed both children" from Father's care. Finally, the trial court found that Lainey "was sexually abused by" Father.

On 19 March 2025, the trial court entered a disposition order. The trial court ordered, inter alia, that:

> 1. It is in the best interests of [Lainey] that custody is placed and remains with the Haywood County Health and Human Services Agency, with placement in the Agency's discretion as permitted by N.C.G.S. 7B-101, *et*[] *seq.*, to provide or arrange for foster care or other placement, and with the authority to authorize necessary medical, dental, psychological and psychiatric services for the juvenile, with all authority granted by N.C.G.S. 7B-903.1 and N.C.G.S. 7B-505.1.
>
> > a. The Haywood County Health and Human Services Agency shall have authority to participate in and obtain and release information regarding the juvenile's Individualized Education Plan and 504 Plan.
> >
> > b. The Haywood County Health and Human Services Agency has the authority to consent to psychotropic medications prescribed to [Lainey] by her medical providers.

Father appealed the trial court's orders on 1 April 2025.

## II. Motion to Dismiss

The Agency and the Guardian ad Litem (the "Parties") assert that Father's appeal from the 19 March 2025 order should be dismissed as moot because he consented to the provision of psychotropic medications to Lainey.

"Like 'standing,' 'mootness is another subset of the justiciability doctrine." *McAdoo v. Univ. of N.C. at Chapel Hill*, 225 N.C. App. 50, 52, 52, 736 S.E.2d 811, 815, 815 (2013) (cleaned up); *Anderson v. N.C. State Bd. of Elections*, 248 N.C. App. 1, 5,

788 S.E.2d 179, 183 (2016) (citation modified). "A case is considered moot when a determination is sought on a matter which, when rendered, cannot have any practical effect on the existing controversy. Typically, courts will not entertain such cases because it is not the responsibility of courts to decide abstract propositions of law." *McAdoo*, 225 N.C. App. at 52, 736 S.E.2d at 815; *Roberts v. Madison Cnty. Realtors Ass'n*, 344 N.C. 394, 398–99, 474 S.E.2d 783, 787 (1996).

Here, Father's proposed issue is appropriate for judicial resolution since he asks us to answer a question pertaining to a live controversy—i.e., whether the trial court should have made findings that the prescription of psychotropic medications was in Lainey's best interests under subsection 7B-505.1(c)(1). *Anderson*, 248 N.C. App. at 5, 788 S.E.2d at 183. Although the parties' arguments are persuasive with respect to the substantive merits of Father's appeal, we fail to see how answering this question amounts to deciding an abstract proposition of law. *See id.* We therefore deny the Parties' joint motion to dismiss.

## III. Analysis

Father asserts the trial court erred by concluding that the Agency possessed the authority to consent to the prescription of psychotropic medication for Lainey. Father maintains that he did not authorize the Agency to provide such treatment, and absent findings that such treatment is in the best interests of Lainey, the trial court committed error. On the other hand, the Parties argue that Father himself consented to the provision of psychotropic medications to Lainey at the disposition

hearing, which satisfied the statutory requirements of N.C. Gen. Stat. § 7B-505.1(c)(1).

## A.   Standard of Review

"The Juvenile Code divides abuse, neglect, and dependency proceedings into two main phases: adjudicatory and dispositional.  At the adjudicatory phase, the Department of Social Services must show by clear and convincing evidence that a juvenile qualifies as abused, neglected, or dependent as defined by the Juvenile Code." *In re L.L.*, 386 N.C. 706, 712, 909 S.E.2d 151, 157 (2024) (cleaned up).  And "at the dispositional phase, the court's task is to design an appropriate plan to meet the needs of the juvenile and to achieve the objectives of the State in exercising jurisdiction." *Id.* (cleaned up).

Ordinarily, "the trial court's dispositional choices . . . are reviewed only for abuse of discretion, as those decisions are based upon the trial court's assessment of the child's best interests." *In re L.R.L.B.*, 377 N.C. 311, 315, 857 S.E.2d 105, 111 (2021).  But "when an appellant argues the trial court failed to follow a statutory mandate, the error is preserved, and the issue is a question of law and reviewed *de novo*." *In re J.C.-B.*, 276 N.C. App. at 192, 856 S.E.2d at 892.  "Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment for that of the [trial court]." *In re T.M.L.*, 377 N.C. 369, 375, 856 S.E.2d 787, 790 (2021) (cleaned up).

## B. Authorization to Consent

Section 7B-505.1 provides the procedures pertaining to the provision of medical care for juveniles placed in nonsecure custody of a department of social services. N.C. Gen. Stat. § 7B-505.1. Relevant here, subsection 7B-505.1(c)(1) requires the director of a department of social services to obtain authorization from the juvenile's parent, guardian, or custodian before the director can consent to the prescription of psychotropic medications:

> (c) The director *shall* obtain authorization from the juvenile's parent, guardian, or custodian to consent to all care or treatment not covered by subsection (a) or (b) of this section, *except* that the court may authorize the director to provide consent after a hearing at which the court finds by clear and convincing evidence that the care, treatment, or evaluation requested is in the juvenile's best interest. Care and treatment covered by this subsection includes:

> (1) *Prescriptions for psychotropic medications.*

N.C. Gen. Stat. § 7B-505.1(c)(1) (citation modified). That said, the statute provides an exception to parental authorization: the trial "court may authorize the director to provide consent after a hearing at which the court finds by clear and convincing evidence that the care, treatment, or evaluation requested is in the juvenile's best interest." *Id.* § 7B-505.1(c).

Chapter 7B defines "director" as "the director of the department of social services in the county in which the juvenile resides or is found, or the director's representative as authorized in G.S. 108A-14." *Id.* § 7B-101(10) (2023) (citation

modified).  Turning to section 108A-14, the director of a department of social services[5]

may delegate the authority to act as his representative to his staff members:

> The director may delegate to one or more members of his staff the authority to act as his representative.  The director may limit the delegated authority of his representative to specific tasks or areas of expertise. The director may designate, subject to the approval of the Commissioner of Labor, additional personnel outside his staff to issue youth employment certificates.

*Id.* § 108A-14(b) (2023); *In re G.B.G.*, 297 N.C. App. 772, 778, 913 S.E.2d 249, 255

(2025); *In re D.D.F.*, 187 N.C. App. 388, 393, 654 S.E.2d 1, 4 (2007); *In re Dj.L.*, 184

N.C. App. 76, 79, 646 S.E.2d 134, 137 (2007).  This includes the "statutory duty to

investigate any reports of abuse, neglect, or dependency of a juvenile and to take

appropriate action . . . ."  *In re N.X.A.*, 254 N.C. App. 670, 675, 803 S.E.2d 244, 247

---

[5] "In 2012, the North Carolina General Assembly enacted legislation that provided counties with new options for how they can organize and govern some local human services agencies, including local health departments and departments of social services."  UNC School of Government, *North Carolina Public Health Law: Consolidated Human Services Agencies (CHSAs)*, https://www.sog.unc.edu/ resources/microsites/north-carolina-public-health-law/consolidated-human-services-agencies-chsas. After this law was passed, the Haywood County Board of Commissioners ultimately determined that it was in the best interest of the County to combine the existing health department and social services department as a consolidated human services agency.  *Id.*  "A consolidated human services agency (CHSA) is a single-county agency that provides local public health services and/or social services to county residents."  Jill D. Moore & Kristi Nickodem, *What is a consolidated human services agency (CHSA)?*, https://www.sog.unc.edu/resources/faqs/what-consolidated-human-services-agency-chsa; *see also* N.C. Gen. Stat. §153A-77(b) (2023).  "In a county with a consolidated human services agency, the county manager must appoint a consolidated human services director who in turn assumes all of the powers and duties of a social services director."  Aimee N. Wall, *County and Municipal Government in North Carolina* 675, https://www.sog.unc.edu/sites/www.sog.unc.edu/files/CMG%2039_SocialServices .pdf.  Furthermore, "the consolidated human services director may delegate some or all of these powers and duties to another person, but the consolidated director retains the ultimate responsibility for ensuring that all obligations and functions involving social services programs and policies are carried out."  *Id.*  Similarly, N.C. Gen. Stat. § 153A-77(e) provides: "Except as otherwise provided by law, the human services director or the director's designee shall have the same powers and duties as a social services director . . . ."

(2017).

Father maintains he did not authorize the Agency to prescribe psychotropic medications to Lainey. He thus argues the trial court committed error by granting the Agency authority to consent to this care and treatment without rendering findings supported by clear and convincing evidence that the medication was in Lainey's best interests. *See* N.C. Gen. Stat. § 7B-505.1(c). Although the order does not contain such findings, a close reading of the transcript reveals that Father had previously provided authorization to a social worker with the Agency in 2024. *See id.*

Indeed, Social Worker Stokes testified to the fact that in August 2024, Lainey's medication management provider recommended Lainey take medications for her depression and anxiety. Ms. Stokes added that she emailed Father, asking for approval of Lainey's medication. Finally, Ms. Stokes noted that Father responded to her email and Lainey received the prescriptions. Shortly thereafter on direct examination, Father conceded to receiving the email from Ms. Stokes and stated that he "gave [her] permission to do that." And on cross-examination, Father was asked:

> Q. -- you had an email exchange with [Ms. Stokes] on November the 6th of 2024?
>
> A. Yes, ma'am. She asked . . . me about the medicine, if [Lainey] could take that medicine. And I said, "Yes, if the doctor, you know, is, you know, wants her to take it, she needs it. She can. She's allowed to take it, you know." I give her permission.

Although the record does not explicitly state Ms. Stokes is an authorized

representative for the director of the Agency, precedent demonstrates that a social worker assigned to a case qualifies as an authorized representative under section 108A-14—even if a juvenile petition does not explicitly state as such—since the statutory duties assigned to a director of a department of social services are "executed by the caseworkers." *In re D.D.F.*, 187 N.C. App. 388, 393, 654 S.E.2d 1, 4 (2007).

For example, in *In re D.D.F.*, the father asserted that the trial court lacked subject matter jurisdiction over the case since the social worker assigned to the matter failed to explicitly state she was an authorized representative for the director in the juvenile petition. *Id.* at 389, 654 S.E.2d at 2. A prior panel of this Court noted:

> In light of the role of social services caseworkers as specifically designated by statute, where the record demonstrates that a DSS caseworker is assigned to the child's case and there is no indication whatsoever that the caseworker was not an "authorized representative" of the director or that she was acting outside of her authority, the DSS caseworker is an "authorized representative" of the director for purposes of filing a petition under N.C. Gen. Stat. § 7B-403. *See* N.C. Gen. Stat. §§ 7B-101(10), -403(a), 108A-14(a)(11), (b).

*Id.* at 393, 654 S.E.2d at 4.

The Court determined that the social worker "was assigned" to the juvenile's case "at its inception," and was charged with taking necessary investigatory duties, including filing the juvenile petition. *Id.* It also noted, "the petition and record before the trial court clearly demonstrate[d] the petitioning caseworker's status and [the father] ha[d] never raised any question as to the caseworker's authority to file a

petition for adjudication." *Id.* The Court thus held:

> Therefore, based upon the statutory duties assigned to the DSS director, which are executed by the caseworkers, [the social worker] was an "authorized representative" of the director who could verify a petition pursuant to N.C. Gen. Stat. § 7B-403. The fact that the petition did not explicitly state that she was an "authorized representative" of the director does not create a jurisdictional defect. *See* N.C. Gen. Stat. §§ 7B-101(10), -403(a), -108A-14(a)(11).

*Id.*; *see also, e.g., In re Dj.L.*, 184 N.C. App. at 80, 646 S.E.2d at 137.

Here, Social Worker Stokes testified to serving as Lainey's foster care social worker for the entire time Lainey was in the Agency's custody. Like the social worker in *D.D.F.*, Ms. Stokes was charged with taking the necessary steps pertaining to Lainey's medical care while in nonsecure custody of the Agency. *See In re D.D.F.*, 187 N.C. App. at 393, 654 S.E.2d at 4; *see also* N.C. Gen. Stat. § 7B-505.1. Further, nothing in the record indicates "that the caseworker was not an authorized representative of the director or that she was acting outside of her authority." *D.D.F.*, 187 N.C. App. at 393, 654 S.E.2d at 4. And like *In re Dj.L.*, Father has never argued, and does not now argue, that Ms. Stokes is not an authorized representative of the Director or that she exceeded the scope of her authority by accepting Father's authorization to consent to the prescription of psychotropic medication. *See In re Dj.L,* 184 N.C. App. at 80, 646 S.E.2d at 137. As in *D.D.F.,* Ms. Stokes qualifies as an "authorized representative" of the director. 187 N.C. App. at 393, 654 S.E.2d at 4.

Although this case does not deal with the filing of a juvenile petition like *In re*

*D.D.F.* and *In re Dj.L,* the same logic applies since receiving authorization from a parent to consent to medical treatment is a duty of the director of a department of social services—just like the filing of a juvenile petition. *See* N.C. Gen. Stat. § 7B-403 (2023) ("Receipt of reports; filing of petition"); *see also* § 7B-505.1 ("Consent for medical care for a juvenile placed in nonsecure custody of a department of social services."). Thus, as in *In re D.F.F.* and *In re Dj.L,* the fact that the record does not explicitly state Ms. Stokes is an authorized representative for the Agency does not change the outcome of this Court's analysis.

Accordingly, we hold the trial court did not err by determining the Agency possessed the authority to consent to the prescription of psychopathic medication for Lainey in light of Father's written authorization. Father's argument is overruled.

## IV. Conclusion

For the reasons above, the trial court did not err by failing to make findings in accordance with N.C. Gen. Stat. § 7B-505.1(c). The record adequately demonstrates that Father authorized a representative for the director of the Agency to consent to the prescription of psychotropic medications for Lainey.


AFFIRMED.

Judges COLLINS and WOOD concur.

Report per Rule 30(e).